975 So.2d 698 (2008)
John JOHNSON, et al.
v.
ORLEANS PARISH SCHOOL BOARD, et al.
No. 2006-CA-1223.
Court of Appeal of Louisiana, Fourth Circuit.
January 30, 2008.
Rehearing Denied February 27, 2008.
*702 Linda S. Harang, Law Offices of Linda S. Harang, L.L.C., Jefferson, Louisiana, and Suzette Bagneris, Bagneris Law Firm, L.L.C., and Stephen B. Murray, Murray Law Firm, and George J.G. Roux, and Joseph M. Bruno, Bruno & Bruno, New Orleans, Louisiana, for Plaintiffs/Appellees.
Evelyn F. Pugh, Chief Deputy City Attorney City of New Orleans, Edward R. Washington III, Deputy City Attorney City of New Orleans, Penya Moses-Fields, City Attorney City of New Orleans, New Orleans, Louisiana, for Defendant/Appellant, City of New Orleans.
Roy J. Rodney, Jr., John K. Etter, Rodney & Etter, LLC, New Orleans, Louisiana, for Defendant/Appellant, Housing Authority of New Orleans.
Nannette V. Jolivette, Douglas L. Grundmeyer, Jonathan C. McCall, Chaffe McCall, L.L.P., New Orleans, Louisiana, for Defendant/Appellant, Orleans Parish School Board.
Mary S. Johnson, Jill T. Losch, Johnson Gray McNamara, LLC, Covington, Louisiana, and Marshall J. Simien, Jr., The Simien Law Firm, Lake Charles, Louisiana, and Richard W. Bryan, Jackson & Campbell, Washington, DC, for Defendant/Appellant, National Union Fire Insurance Company of Pittsburgh, PA.
Matthew J. Farley, Maura Z. Pelleteri, Amy M. Seltzer, Krebs, Farley & Pelleteri, P.L.L.C., New Orleans, Louisiana, for Defendants/Appellants, U.S. Fire Insurance Company and Republic Insurance Company.
Lizbeth J. Lemke, Cohn Baughman & Martin, Chicago, Illinois, for U.S. Fire Insurance Company.
Claude A. Greco, Hailey, McNamara, Hall, Larmann & Papale, L.L.P., Metairie, Louisiana, for Defendant/Appellant, Louisiana *703 Insurance Guaranty Association, as successor to Southern American Insurance Company, in Liquidation.
Ralph S. Hubbard III, Celeste D. Elliott, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, Louisiana, Amicus Curiae, Complex Insurance Claims Litigation Association.
(Court composed of Judge CHARLES R. JONES, Judge JAMES F. McKAY III, Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO, JR.).
JAMES F. McKAY III, Judge.
From the early 1900's until approximately 1958, the City of New Orleans (City) leased more than one hundred acres of land in the City's ninth ward for the operation of a municipal landfill and garbage dump. The site, known as the Agriculture Street Landfill (ASL), was bordered by Almonaster Boulevard on the west, Higgins Boulevard on the north, Louisa Street on the east, and the Peoples Avenue Canal and railroad tracks on the south. In 1965, the City reopened the ASL site for the disposal of massive quantities of debris created by Hurricane Betsy.
In 1967, the City and the Housing Authority of New Orleans (HANO) entered into a cooperative agreement for the development of residential properties in the Desire area of the City. Between 1969 and 1971, Drexel Development Corporation constructed the Press Park town homes and apartments for HANO. No remediation or special site preparation was done before Press Park was constructed. In 1971, HANO purchased the completed Press Park project from Drexel and has owned and operated the site since that time. Some Press Park tenants participated in a "turn key" program, whereby a portion of their monthly rent was placed in an escrow account and applied toward the purchase of their town home unit. When their escrow account reached the amount needed for purchase of the unit, HANO transferred title of the unit to the tenant. HANO never advised any of the prospective Press Park tenants or home buyers that the site had once been a part of the City's landfill.
In the late 1970s, the City performed soil testing in the Gordon Plaza area of the ASL neighborhood, in anticipation of the construction of the Gordon Plaza single-family homes. As a result of the soil testing, the City required the developers of Gordon Plaza to add topsoil before constructing the homes. In 1980, sixty-seven family homes comprising Gordon Plaza were built. The Gordon Plaza home buyers were not told that their homes were located on what had once been a part of the City's landfill.
In 1975, the Orleans Parish School Board (School Board) purchased a tract of land along Abundance Street in the ASL neighborhood, with the intent to build an elementary school. In 1984, the School Board began plans for construction of Moton Elementary School on the site. Because the School Board knew when it purchased the property that the site had once been a part of the City's landfill, the School Board hired engineering firms to conduct an environmental evaluation of the property. Environmental testing on the site identified the presence of numerous toxic and hazardous materials, including lead, arsenic, mercury, and polycyclic aromatic hydrocarbons. Because of the presence of the toxic and hazardous materials, the School Board hired several environmental consultants to advise them on how the site could be remediated to eliminate the danger of harmful exposures created by the presence of hazardous materials. *704 The environmental consultants recommended that the entire site be excavated to a depth of three feet, with the top three feet of contaminated soil removed and replaced with two feet of clean topsoil. Between the clean topsoil and the hazardous materials, the consultants recommended that a layer of six inches to one foot of impermeable clay be placed over the entire site. In 1986-87, Moton Elementary School opened for kindergarten through sixth grade with an enrollment of approximately nine hundred students. The School Board did not tell its employees or the parents of the students that the school had been built on a part of the City's former landfill or that environmental testing had identified the presence of toxic materials on the site. During the 1991-92 school-year, there were plumbing problems at Moton Elementary which required under-slab construction and repairs. This necessitated the construction of a trench and the breach of the three-foot layer of clean topsoil.
The Environmental Protection Agency (EPA) tested the soil in parts of the ASL neighborhood in 1986 to determine whether the ASL site was contaminated. The residents were not given the results of the EPA's 1986 soil tests nor were they told that their property was contaminated or given any special instructions to follow or precautions to take to protect themselves from exposures to the soil. Between 1985 and 1986, the Louisiana Department of Health and the Agency for Toxic Substance Disease . Registry (ATSDR) conducted a public health screening of children in the ASL neighborhood to determine whether there was an increased incidence of elevated blood lead levels. The residents were never told that their children had been exposed to excess levels of lead, nor were they given any special instructions or precautions to follow to protect their children from exposures to the soil.
In 1993, the EPA came back to the ASL site and conducted more soil tests throughout the neighborhood. The tests indicated that the soil was contaminated with more than one hundred forty toxic and hazardous materials, more than forty of which are known to cause cancer in humans. The EPA told the ASL residents to take special precautions to protect themselves from any exposure to the soil. In 1994, the EPA placed a portion of the ASL neighborhood on the National Priorities List and later that same year it declared that the ASL site was sufficiently contaminated to be named a Superfund site. Later that same year, the School Board closed the Moton Elementary School campus and the ASL residents formed the Concerned Citizens of the Agriculture Street Landfill, Inc. to qualify for federal grant funding to pay for the services of an environmental technical advisor.
In the mid-1990s, the EPA proposed a remediation plan for the ASL site that would remove and replace the top two feet of soil, where possible, with a semi-permeable barrier between the clean topsoil and the contaminated soil. The soil under buildings and the streets would not be disturbed. The ASL residents opposed the EPA's plan as being inadequate to remediate the site. The ASL residents supported an alternative voluntary relocation/buy-out plan. The EPA rejected the requests of the ASL residents and from 2000-2001, the EPA financed a $20,000,000.00 remediation project. In the remediation process, approximately two feet of soil was removed from around houses and buildings where possible. Due to underground utilities, water lines, etc., only one foot of soil was removed in some areas. After the EPA completed the remediation work, the ASL residents were *705 given a certificate of completion confirming that their property had been partially remediated. The EPA also gave the ASL residents a list of permanent restrictions on the use of their property and advised the ASL residents that they were responsible for maintaining the integrity of the clean layer of topsoil and the felt-like material that comprises the semi-permeable barrier between the clean layer of topsoil and the ground below.
Not satisfied with the steps taken to correct the problems with the ASL neighborhood, a number of the residents proceeded with a class action lawsuit.[1] The named defendants in the action include the City, HANO, the School Board, and HANO's insurers, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, U.S. Fire Insurance Company, Republic Insurance Company, and South American Insurance Company/Louisiana Insurance Guaranty Association. The plaintiff class has previously been defined as follows: 1) current and former residents who have lived on the site of the former landfill, as defined as the area bounded on the north by Higgins Blvd., on the east by Louisa Street, on the south by Florida Avenue and on the west by Almonaster Avenue and the Peoples Avenue Canal, for at least twelve months prior to February 1, 1994; 2) current and former business owners and their employees who have operated a business on the former landfill site, as described above, for at least twelve months prior to February 1, 1994; 3) current residents who are the owners of record of their homes, or who are buying their homes but have not yet completed their payments; and 4) former students and employees of Moton Elementary School who attended or worked at the school on the site of the former landfill for at least twelve months or one school year prior to February 1, 1994.
In the instant case, a bench trial began on January 7, 2005 and ended on March 11, 2005. On January 12, 2006, the trial court entered judgment in favor of the plaintiff class and against the defendants. The trial court made the following findings and rulings. The trial court found that the class members' claims were timely filed August 31, 1993 and were not prescribed. The trial court also found that neither the City, HANO, or the School Board met their burden of proving the defense of "discretionary function" immunity. The trial court dismissed the School Board's cross claim against the City under the Hazardous Waste Cleanup Law. The trial court also dismissed the School Board's third party claims against HANO for stigma defenses and diminution of property value. The trial court found the City (50%), HANO (50%) and their insurers liable jointly and in solido to the members of the first three sub-classes. The trial court found the School Board and its insurers liable to the members of the fourth group.
Property owners on the actual site were awarded their fair market property values and those in the adjacent area were awarded 10% of their property value for stigma damages. For emotional distress, those who lived on the site were awarded $4,000 per year for 1 to 5 years, $25,000 *706 for 5 to 10 years, $30,000 for 10 to 15 years, $40,000 for 15 to 20 years, and $50,000 for 20 years or more. Those who lived in the adjacent area were entitled to $2,500 in emotional distress. Students and workers at Moton Elementary were awarded $2,000 per year. The following members of the first three sub-classes were awarded the following amounts: Phyllis Mineva George Smith ($72,000), Don Harrison Lewis, Sr. ($155,000), Nathan Parker ($145,000), Viola Naomi Washington Allen ($140,000), Peggy Williams Grandpre ($63,500), Lizette Gaines Watson ($7,000), Fannie Lee Johnson ($50,000), Iris Russell Myers ($2,500), Diarra Ayodele McCormick ($40,000); the school board is jointly liable in the amount of $12,000 for the time Diarra was a student at Moton.
For Groups 1, 2, and 3 of the class the trial court assigned both the city 50% virile share of liability and HANO and its insurers (according to their years of coverage) 50% share virile liability. The school board was assigned 100% of the liability for group 4.
The trial court found that none of the plaintiffs were contributorily negligent.
The trial court found that the city was negligent in its actions and inactions that resulted in the conversion of its own former municipal landfill into a residential area that the EPA deemed unreasonably dangerous in 1994. This finding was based on Civil Code Article 2315 as it existed prior to 1980. HANO was found negligent under Civil Code Article 2317 as it existed prior to 1980. HANO's insurers were also liable to the plaintiffs for their physical and emotional damages. It is from this judgment that the defendants now appeal.
DISCUSSION
The defendants all essentially argue that the trial court erred in not employing a de novo review; not finding that the plaintiffs' claims had prescribed; not finding that the defendants were protected from liability by the discretionary immunity function; finding that the defendants were solidarily liable; applying current environmental laws and regulations retroactively and finding that property within the class boundaries was and still is unreasonably dangerous. The defendants also argue that the trial court erred in awarding damages for diminution of property value and emotional distress. The School Board also argues that it is not liable for acts of its independent contractors and the School Board itself is a member of the class. Finally, the various insurers argue that the trial court erred in finding that their respective policies provided coverage for the plaintiffs' claims against HANO.
Standard of Review
Factual findings of the jury are reviewed using the "manifest error" or "clearly wrong" standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Reviewing and reversing the factfinder's determinations involves a two-part test developed by the Louisiana Supreme Court. Mart, v. Hill, 505 So.2d 1120, 1127 (La.1987). This test requires the reviewing court to find that no reasonable factual basis exists for the trial court's findings and that the findings are wrong or "manifestly erroneous" according to the record. Id. The record must be reviewed in toto to discern whether the factfinder was clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). The trial court has a "better capacity to evaluate live witnesses." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Therefore, "the appellate court must determine if the factfinder's decision was a reasonable one." Norfleet v. Lifeguard Transp. Serv., Inc., XXXX-XXXX (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 852. "[W]here *707 two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883.
Appellate courts review legal errors with a de novo standard. Overton v. Shell Oil Co., XXXX-XXXX (La.App. 4 Cir. 7/19/06), 937 So.2d 404, 410.
In the instant case, the defendants contend that de novo review of the trial court's factual findings and legal conclusions is required because the trial court committed legal errors. The defendants' contention, however, is wrong. The bases for this appeal are all questions of fact. When the actual basis for an appeal is a question of fact, the trial court's findings of fact are to be given great discretion and are to be reversed only where there is manifest error.
Regarding damages, the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
Prescription
The trial court found that the class members' claims were filed on August 31, 1993 and had not prescribed. The defendants contend that the trial court disregarded the evidence to hold that plaintiffs' claims against them were not prescribed and impermissibly shifted the burden of proof on prescription to the defendants. The trial court summarized its views on the prescription question as follows:
From 1984 through 1993 the residents were told by various governmental agencies, including the EPA, the ATSDR, the Louisiana Department of Environmental Quality ("DEQ"), the Louisiana Department of Health, and the School Board that their neighborhood was safe. During this same period of time, the City and HANO were publicly silent. In fact, the City and HANO claim they had no knowledge until 1993 that the property was contaminated.
The Court also finds that the Defendants should not benefit from their own silence. During the same period of time, the Defendants claim they knew nothing about the contaminated condition of the soil or the hazardous materials to which the plaintiffs were being exposed on a daily basis. Nevertheless, the Defendants claim that somehow the Plaintiffs, who are ordinary citizens with no special education or scientific training should have been able to acquire knowledge superior to that of the City, HANO, the School Board, The Louisiana Department of Health, DEQ, ATSDR, and the EPA.
Louisiana courts have long recognized that prescription does not run against one unable to act, which is based on the ancient civilian doctrine of contra non valentem agree nulla currit praescripto. Hendrick v. ABC Ins. Co., 2000-2403, 2000-2349 (La.5/15/01), 787 So.2d 283, 289. In such case, the prescriptive period begins to run on the date that the injured party discovered or should have discovered the existence of facts that would entitle him to bring suit. Doskey v. Hebert, 93-1564 (La.App. 4 Cir. 9/29/94), 645 So.2d 674, 679 citing Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (1970). There are four categories of situations *708 where Louisiana courts have applied the doctrine of contra non valentem to prevent the accrual of liberative prescription: (1) where there is some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Id.
The first three of these categories do not apply in the instant case. However, the fourth category does apply. The fourth category, commonly known as the discovery rule, provides that prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. Id. Based on the record before this Court, there is nothing to indicate that the plaintiffs in the instant case knew or should have known who to file suit against or what to file suit for before August of 1993. We must also be mindful of the fact that the City, HANO, and the School Board all operated as if everything was alright with the ASL site during the time period leading up to the plaintiffs filing suit. If we are to assume that these defendants, who were in a superior position as to know what was going on, were not overly concerned about any potential harm or injury to the plaintiffs, we must assume the same for the plaintiffs. As such, we find no error in the trial court's finding that the plaintiffs' claims had not prescribed.
Applicable Law
Being that we have determined that the plaintiffs' claims against the defendants have not prescribed, we must now explore whether the trial court applied the correct law in this case. To decide whether a claim is prescribed, a court looks to the time when a plaintiff knew or should have known that a cause of action arose or existed. However, to decide what substantive law to apply, a court must look to when the cause of action accrued, i.e. when the injury or insult to the plaintiff first occurred. Cole v. Celotex, 599 So.2d 1058, (La.1992); Austin v. Abney Mills, Inc., XXXX-XXXX (La.9/4/02), 824 So.2d 1137. For a negligence cause of action to accrue, three elements are required: (1) fault; (2) causation; and (3) damages. A cause of action may accrue before a plaintiff sustains or is even aware of all the damages occasioned by the defendant's negligence. Id.
In the instant case, the trial court determined that the City and HANO are liable for their conduct beginning in 1968-69 when they entered into a "Cooperative Agreement" to develop low-income housing in the ASL neighborhood. Both the City and HANO knew that the Press Park site had once been a municipal landfill, but neither took any steps to cover the site with any protective layer of soil. Based on the principle set out in Cole v. Celotex and its progeny, Austin v. Abney Mills, the trial court found that the pre-1987 law of negligence, strict liability, premises liability, comparative fault, and solidary liability is the law of this case. Both Cole and Abney Mills involved claims pertaining to a latent disease that manifests only after many successive years of almost daily occupational asbestos exposure. Both cases stand for the proposition that when significant acts of negligence giving rise to the plaintiffs damages occur many years *709 before all of the damages are known or suffered, then the law that applies to the claim is the law that was in effect when the significant negligent acts occurred. Likewise, the trial court believed that negligent acts perpetrated by the City and HANO in the instant case were akin to the negligent acts of the defendants in Cole and Abney Mills and that their exposures to the former landfill were of a similar nature to the plaintiffs' exposures to asbestos in Cole and Abney Mills. The City's and HANO's negligent acts occurred before the laws on negligence, strict liability, premises liability, comparative fault, and solidary liability changed. The trial court held that the plaintiffs' causes of action against the City "accrued" in 1968-69 and their causes of action "arose" in 1993. The trial court also found that the City and HANO were liable jointly and in solido. As such, we find no error in the trial court's application of the pre-1980 law to the conduct of the City and HANO.
The trial court determined that the School Board was liable for its conduct in 1984-85 when the school was under construction. The School Board ignored its consultants' advice to install a layer of clay beneath the clean dirt that was brought to the site., The School Board also failed to advise its contractor and subcontractors that the site was contaminated and that the dirt being removed from the site was contaminated and had to be disposed of under applicable state and federal regulations. As such, the trial court found that the school site was defective under Civil Code articles 2317 and 2322 as they existed prior to 1987. Being that the School Board's conduct took place in 1984-85, we employ the same rationale discussed immediately prior in finding that the trial court did not err in applying the pre-1987 substantive law to the School Board.
Discretionary Function Immunity
The defendants contend that the trial court's finding that their conduct was not protected by discretionary function immunity was based on overturned jurisprudence and was not based on the evidence presented.
La. R.S. 9:2798.1(B) & (C) provide:
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy making or discretionary acts when such acts within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable: (1) to acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or (2) to acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
Based on this statute, the defendants contend that even if they are negligent, they are nevertheless shielded from tort liability to the class under the principle of "discretionary function" immunity. The trial court found that the defendants did not meet their burden of proof on this affirmative defense.
The Louisiana Supreme Court established a two-step test for courts to follow when determining whether the immunity applies. See Simeon v. Doe, 618 So.2d 848, 852-53 (La. 1993). A court must first determine whether a statute, regulation, or policy requires the governmental agency to follow a particular course of action. If there is such a requirement, then there is no choice or discretion, and *710 the immunity does not apply. If, however, the governmental entity has a choice about whether to undertake the activity, then the entity will be protected by the immunity only if the choice is grounded in "social, economic, or political policy." Id. The application of this affirmative defense is "a question of fact to be determined through a trial." Lambert v. Riverboat Gaming Enforcement Div., 96-1856 (La. App. 1 Cir. 12/29/97), 706 So.2d 172, 178. Once a defendant establishes its conduct involves a matter of choice or discretion that is not the end of the inquiry. A court must also consider whether the conduct in question occurred at the "operational level", or how the entity carried out its policy or decision. The immunity statute does not protect governmental entities against legal fault or negligent conduct at the "operational level", but only confers immunity for policy decisions, that is decisions based on social, economic, or political concerns. Chancy v. National Railroad Passenger Corp., 583 So.2d 926, 929 (La.App. 1 Cir. 1991). As such, once a discretionary decision is made, the government entity is riot protected from liability for conduct in carrying out the discretionary decision. Socorro v. Orleans Levee Bd., 561 So.2d 739, 756 (La.App. 4 Cir.1990).
In the instant case, the defendants raised the "discretionary function" immunity as an affirmative defense in their answers and pleadings. As such, the defendants had the burden of proof on this affirmative defense. It must be proved by a preponderance of the evidence. Abadie v. Markey, 97-684 (La.App. 5 Cir. 3/11/98), 710 So.2d 327, 332. Accordingly, the defendants had to prove at trial that their actions were "grounded in social, economic, or political policy." The City's and HANO's decision to provide the service of low income housing was certainly an act of discretion, as was the School Board's decision to build Moton Elementary School. However, every subsequent decision that the defendants made were of an operational nature. The failure to conduct an adequate investigation into the environmental conditions at the site, the failure to undertake proper remediation work at the site, and the failure to warn residents of the potential dangers associated with the site were all operational failures. In its reasons for judgment, the trial court correctly points out that "the defendants continually fail to comprehend that it was their failure to make reasonable operational decisions that subject them to liability." We find no error in the trial court's finding that the defendants' conduct was not protected by discretionary function immunity.
Environmental Laws and Regulations
The defendants contend that the trial court erred by retroactively applying current environmental laws and regulations, resulting in the court erroneously finding the defendants liable. The defendants also contend that the trial court failed to recognize that claims challenging the environmental protection agency and the Louisiana Department of Environmental Quality's decisions about the neighborhood were precluded under supremacy and separation of powers principles. The plaintiffs contend that there is a difference between a regulatory ruling and scientific or medical reality.
Investigations throughout Press Park in 1993-94 determined that there was an extremely high level of lead at the surface. The EPA authorized a twenty million dollar partial remediation of the upper one to two feet of soil in parts of Press Park (no soil was removed beneath any buildings or streets) in order to remove in the EPA's words, the "immediate health threat." No environmental specialist has said that Press Park is now clean. No environmental *711 specialist has said that Press Park poses no future risk of harm to the residents. In fact, the EPA has identified 149 contaminants in the Press Park soil and the only barrier between the contaminated soil and the new clean soil is a semi-permeable barrier that will not prevent the upward migration of the contaminants. In her report to the School Board in 1985, Dr. Verna Campbell stated that although the health effects for the specific toxins at the site are known, the lowest level at which the adverse health effects can occur is not known. Dr. Campbell also reminded the School Board that for the 49 known carcinogenic materials, "the scientific literature makes it clear that no known safe level has been identified below which exposure can be assured not to result in cancer in some of the exposed population." Accordingly, we agree with the trial court's assessment that a regulatory standard and a guarantee of safety are not synonymous. Based on the evidence that was before the trial court, this is a reasonable conclusion and as such we may not reverse this finding unless it is clearly wrong or manifestly erroneous.
Damages
We find no error in the trial court's awarding of damages for diminution of property values. There is objective evidence in the record to make such a finding reasonable.
The trial court's awarding of damages for emotional distress, however, is more problematic. The correct standard for the recovery of negligent infliction of emotional distress absent physical injury is that the plaintiff must show an "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Moresi v. State Through Dep't of Wildlife and Fisheries, 567 So.2d 1081, 1096 (La.1990); Bonnette v. Conoco, Inc., 2001-2767 (La.1/28/03), 837 So.2d 1219. Louisiana courts have also recognized that plaintiffs, without regard to physical injury, may recover for emotional distress and inconvenience resulting from damage to their property, but only in the following categories of cases: (1) when the property was damaged by an intentional or illegal act; (2) when the property was damaged by acts giving rise to strict or absolute liability; (3) when the property was damaged by activities amounting to a continuous nuisance; and (4) under circumstances where the owner was present or nearby at the time the damage occurred and suffered psychic trauma in the nature of or similar to a physical injury as a direct result of the injury itself. Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 7.02[6] (2nd ed.2004). The jurisprudence, however, has limited such recovery by requiring that the emotional distress be severe and not merely the result of the usual worry or anxiety attendant to property damage. See Farr v. Johnson, 308 So.2d 884 (La.App. 2d Cir.1975). In Doerr v. Mobil Oil Corp., XXXX-XXXX (La-App. 4 Cir. 6/14/06), 935 So.2d 231, this Court allowed recovery of damages for emotional distress suffered by plaintiffs that was caused not by the usual worry or anxiety associated with property damage, but legitimate concern about health effects. In Doerr, residents of St. Bernard Parish who suffered no physical injury resulting from contamination of the parish water supply due to oil refinery discharge were entitled to damages for negligent infliction of emotional distress, given that residents had legitimate concerns regarding the health effects of the contamination and took actions such as drinking only bottled water or installing filtration systems and checking the odor and color of the water at each use to test for further contamination. In Doerr, plaintiffs received lump sum damage *712 awards of anywhere from $500 to $2000 while two plaintiffs who had only damages for emotional distress were each awarded only $250.
In order to determine whether the general damages award shocks the conscience, the court should look to the individual circumstances of the case. In re Medical Review Panel Bilello, 621 So.2d 6, 10 (La.App. 4 Cir.1993). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). In the instant case, the trial court made its awards of damages for emotional distress based on the following formula: those who lived on the site were awarded $4000 per year for 1 to 5 years, $25,000 for 5 to 10 years, $30,000 for 10 to 15 years, $40,000 for 15 to 20 years, and $50,000 for 20 years or more. Those who lived in the adjacent area were awarded to $2,500 and students and workers at Moton Elementary were awarded $2,000 per year. Based on the fact that none of the plaintiffs had any physical injuries and considering Doerr, these amounts "shock the conscience." At this point, we would ordinarily resort to an examination of previous awards in other cases to determine the highest or lowest reasonable amount that a reasonable trier of fact could have awarded for negligent infliction of emotional distress, but other than Doerr, there really are no other cases with comparable types of damages, i.e. emotional distress with no physical injuries caused by exposure to a toxic element. See Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Therefore, we must use our own discretion to determine the highest reasonable amount under these particular circumstances that these particular plaintiffs could have been awarded for these particular injuries. The highest amount that would appear reasonable would be around half the amount that the trial court awarded for damages due to emotional distress. Accordingly, we now reduce the trial court's award of damages by 50%.
School Board's Claims
The School Board claims to be a member of the plaintiff class. However, the trial court dismissed the School Board's cross-claims against the City of New Orleans as well as the School Board's third-party claims against HANO. We find no error in these rulings. The School Board did not prove that either the City or HANO are liable to it or that the City or HANO owe it damages. The School Board exercised its rights to be represented by its own attorneys in bringing these claims and the School Board did not ask for any assistance before, during, or after trial.
The School Board also attempts to resurrect its third-party claims against BFI, CFI, New Orleans Public Belt Railroad, Edward Levy Metals, and others. The trial court correctly dismissed these claims on exceptions of no cause of action. See Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 11/3/04), 890 So.2d 579; Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 2/16/05), 897 So.2d 812; Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 3/22/06), 929 So.2d 761; and Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 8/9/06), 938 So.2d 219.
Insurance Coverage
Southern American Insurance Company issued a policy of comprehensive general liability (CGL) to HANO that was in effect from January 19, 1976 to May 31, 1978 and *713 a policy of excess coverage that was in effect from March of 1976 to March of 1977.[2] U.S. Fire Insurance Company issued a policy of comprehensive general liability (CGL) that was in effect from May 30, 1978 to May 30, 1981. National Union Fire Insurance Company of Pittsburgh, PA issued a policy of comprehensive general liability to HANO that was in effect from May 30, 1981 to May 30, 1984. Republic Insurance Company issued a policy of comprehensive general liability (CGL) to HANO that was in effect from May 31, 1984 to May 31, 1985. In addition to the "Comprehensive General Liability Insurance" portion of each of the insurers' policies, which provides "Coverage A  Bodily Injury" and "Coverage B  Property Damage," the policies contain separate and distinct "Personal Injury Liability Insurance" for what is termed under the policy "Coverage P  Personal Injury" This coverage, which is set forth under a separate heading in each of the policies, is an additional aspect of coverage, for claims that are not covered under the "Comprehensive General Liability Insurance" policy, The trial court found that this "Personal Injury Liability" provides coverage for the plaintiffs' loss of property values and emotional distress claims.
The purpose of liability insurance is to afford the insured protection from damage claims. Policies therefore should be construed to effect, and not to deny, coverage. Thus, if policy language is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. Garcia v. St. Bernard Parish School Bd., 576 So.2d 975, 976 (La.1991); Breland v. Schilling, 550 So.2d 609, 610 (La.1989). As such, any ambiguity in the policy must be resolved in favor of the insured.
The "personal injury" portion of each of the policies in question provides that the insurer will pay "all sums" that the insured (HANO) becomes legally obligated to pay as a result of the insured's invasion of a right of private occupancy. Unlike the CGL portion of the policies in question, there is no declaration limiting the scope of this coverage. The trial court found that since the plaintiffs' claims are for damages arising from the "interference with plaintiffs' reasonable and comfortable use and enjoyment of their property," i.e. an invasion of their right of private occupancy, the language of each of the insurers' "personal injury" portion of their policies provides coverage for all of the plaintiffs' claims asserted in this lawsuit. This is an issue of first impression in this state. Courts in jurisdictions with rules of construction similar to Louisiana's have determined that interference with a right of, occupancy constitutes "personal injury" as opposed to "bodily injury"' which usually means a physical injury or illness, under the same policy language contained in the "personal injury" coverage portion of the policies in question in this case. In Millers Mutual Ins. Ass'n of Illinois v. Graham Oil Co.,[3] an Illinois state court found that seepage of gasoline onto the plaintiff's property from the defendant's property constituted a "wrongful entry" under the personal injury coverage portion of the policy and was covered, even though the same claim was not covered under the property damage or bodily injury coverage portions of the policy. Similarly, in Titan Holdings Syndicate, *714 Inc. v. City of Keene, N.H.,[4] a federal court held that claims for damages from the operation of the defendant's facility constituted an "invasion of a right of private occupancy" giving rise to coverage under the "personal injury" portion of the policy at issue. Accordingly, we agree with the trial court's finding on this issue.
HANO's insurers argue that because the plaintiffs did not begin to suffer emotional distress until 1994, their injuries did not manifest, i.e. "occur" within the policy period. We do not agree with this argument. In Cole v. Celotex, the Louisiana Supreme Court concluded that the insurance coverage is triggered by the mere exposure to the harmful conditions during the policy period. 599 So.2d at 1076-77. The Court reasoned that the exposure theory comports with a literal construction of the policy language, maximizes coverage, and honors the contracting parties' intent by providing for consistency between the insured's tort liability and the insurer's coverage. Id. The "personal injury" coverage in the policies does not place any restrictions on when the damages must occur for coverage to arise. Instead, the "personal injury" coverage portion in each of their policies states that the policy will provide coverage for all damages arising from an invasion of a right to a private occupancy regardless of the date of manifestation of the injury. For the coverage to apply, all that the policies require is for the "invasion of the right of private occupancy" to take place during the policy period.
The plaintiffs' emotional distress claims are claims for "bodily injury" under each of the policies that the insurer defendants issued in favor of HANO. Louisiana Courts have construed claims for emotional distress to be claims for "bodily injury" for purposes of insurance coverage. Crabtree v. State Farm, Ins. Co., 93-0509 (La.2/28/94), 632 So.2d 736; Levy v. Duclaux, 324 So.2d 1 (La.App. 4 Cir.1975). In Crabtree, the Louisiana Supreme Court held that emotional injuries are "sickness or disease," because "[w]hile such an' experience operates primarily on the mind of the victim such suffering cannot be isolated from the body." 632 So.2d at 743. The Court went on to say, "We are unable to separate a person's nerves and tensions from his body." Id.
For the foregoing reasons, we agree with the trial court that this "Personal Injury Liability" provides coverage for the plaintiffs' loss of property values and emotional distress claims. We also clarify that HANO's insurers should have to pay all sums owed by HANO to the class, subject to their right to seek contribution from the other insurers, HANO, and the City for any sums they are obligated to pay for claims that fall outside of their terms of coverage.
CONCLUSION
Based upon our careful review of the extensive record in this case, we find that the trial court erred in its award of damages for emotional distress. Accordingly, we reduced the amount awarded for emotional distress by 50%. We find nothing else with the trial court's judgment to be manifestly erroneous or clearly, wrong. We also find that the trial court correctly applied the law. Accordingly, in all other respects the judgment of the trial court is affirmed.
AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.
CANNIZZARO, J., dissents in part with reasons.
*715 CANNIZZARO, J., Dissenting in part.
I respectfully dissent from the majority opinion insofar as it upholds the trial court's finding that the "Personal Injury Liability" ("PIL") provisions of the defendant-insurers' policies provide coverage for the plaintiffs' loss of property values and emotional distress claims.
As set forth in her reasons for judgment, the trial court found as a matter of fact and law that the defendant, the Housing Authority of New Orleans ("HANO"), was negligent in directing the construction of Press Park on the Agriculture Street Landfill ("ASL") site, and HANO's negligence was the cause of the plaintiffs' injuries. The court held that as a result of HANO's negligence, the plaintiffs suffered compensable damages in the form of loss of property value and extraordinary mental and emotional distress. Correspondingly, the court also concluded that because the plaintiffs' damages arose from the "`interference with [their] reasonable and comfortable use and enjoyment of their property,' i.e. an invasion of their right to private occupancy," their claims were covered under the PIL provisions in the defendant-insurers' policies. The court also found that HANO, as the owner and operator of Press Park, was strictly liable to the Press Park tenants and residents pursuant to La. C.C. art. 2317.
Between 1971 and 1993, the year the plaintiffs filed their lawsuit, the defendant, HANO, was insured intermittently by the following four named defendant-insurers: Louisiana Insurance Guaranty Association ("LIGA") as successor in interest to Southern American Insurance Company; U.S. Fire Insurance Company of America ("U.S. Fire"); National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and Republican Insurance Company ("Republic"). In addition to the "Comprehensive General Liability Insurance" ("CGL") portion of each of the insurers' policies, which provides "Coverage A  Bodily Injury" and "Coverage B  Property Damage," the policies contain separate and distinct PIL insurance for what is termed under the policy "Coverage P  Personal Injury." This PIL coverage, which is set forth under a separate heading in each of the policies, is an additional aspect of coverage, for claims not covered under the CGL policies.[1] In relevant part, the PIL policies issued by the defendant-insurers provided the following:
I. Coverage P  PERSONAL INJURY LIABILITY
The company will pay on behalf of the insured all sums which the insured

*716 [HANO] shall become legally obligated to pay as damages because of injury (herein called `personal injury') sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business: Group A  false arrest, detention or imprisonment, or malicious prosecution:
Group B  the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right to privacy; . . . ;
Group C  wrongful entry or eviction, or other invasion of the right of private occupancy;
if such offense is committed during the policy period . . . [2]
It is under this foregoing section (Group C) of the respective policies that the plaintiffs sought coverage for their alleged injuries.
After considering the defendant-insurers' insurance polices in full, I believe the trial court erred, as a matter of law, in construing HANO's interference with the plaintiffs' reasonable and comfortable use and enjoyment of their property as an "invasion of the right of private occupancy" as contemplated by the PIL portion of the policies.
It is well-settled that an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contract set forth in the Louisiana Civil Code. Sims v. Mulhearn Funeral Home, Inc., 07-0054, p. 7 (La.5/22/07), 956 So.2d 583, 589. According to those rules, the responsibility of the judiciary in interpreting insurance contracts is to determine the parties' common intent. Id.; See La. C.C. art. 2045. In ascertaining the common intent, words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case, the words must be ascribed their technical meaning. See La. C.C. art. 2047; Sims, 07-0054, p. 8, 956 So.2d at 589.
An insurance contract is to be construed as a whole and each provision in the contract must be interpreted in light of the. other provisions. One provision of the contract should not be construed separately at the expense of disregarding other provisions. See La. C.C. art. 2050; Sims, 07-0054, p. 8, 956 So.2d at 589. Neither should an insurance policy be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Id.
When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written. See La. C.C. art. 2046; Sims, 07-0054, p. 8, 956 So.2d at 589. "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." Sims, 07-0054, pp. 8-9, 956 So.2d at 589. The rules of contractual interpretation do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making a new *717 contract when the terms express with sufficient clarity the parties' intent. Id. at p. 9, 956 So.2d at 589.
If after applying the general rules of contractual interpretation to an insurance contract, an ambiguity remains, the ambiguous contractual provision is generally construed against the insurer and in favor of coverage. See La. C.C. art. 2056; Sims, 07-0054, p. 9, 956 So.2d at 590. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. Id. This strict construction principle applies, however, only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. Id. The determination of whether a contract is clear or unambiguous is a question of law. Id.
Under the defendant-insurers' policies, coverage for PIL is limited to a specifically-enumerated list of torts or "offenses" that fall within that coverage provision. PIL coverage also requires that the enumerated offense be "committed" (a term that connotes an intentional, deliberate or willful act) in the conduct of HANO's business.
Louisiana law defines "intent" to mean "`that the defendant either desired to bring about the physical results of his act or believe'd they were substantially certain to follow from what he did.'" Cole v. State Department of Safety and Corrections, 01-2123, p. 7 (La.9/4/02), 825 So.2d 1134, 1140 (quoting Bazley v. Tortorich, 397 So.2d 475 (La.1981)). Each enumerated offense in Coverage P is an intentional tort under Louisiana law. See W. McKenzie and H. Alston Johnson, III, 15 Louisiana Civil Law Treatise: Insurance Law & Practice §§ 12.3, 12.9 (false imprisonment), § 12.17 (malicious prosecution); Fitzgerald v. Tucker, 98-2313, p. 10 (La.6/29/99), 737 So.2d 706, 715 (defamation); Ledbetter v. Concord Gen. Corp., 564 So.2d 732, 737 (La.App. 2d Cir.1990) ("wrongful entry" occurred when a hotel guest broke into another guest's room); Regency Motors of Metairie, L.L.C. v. Hibemia-Rosenthal Ins. Agency, Inc., 03-1312 (La.App. 5 Cir. 2/23/04), 868 So.2d 905, writ denied, 04-0753 (La.5/7/04), 872 So.2d 1087 (eviction requires actual impingement on the occupant's possessory rights); Holmes, Appleman on Insurance Law & Practice (2nd Ed.) § 131.2[D] ("Personal injury liability coverage obligates the insurer to indemnify for liability incurred for certain intentional acts by the insured.").
It follows then that "other invasion of the right of private occupancy" also requires an active, knowing, and intentional act. This conclusion is further bolstered by the plain, ordinary and generally prevailing meaning of the term "invasion" as an actual entry.
In this case, the plaintiffs never alleged nor introduced any evidence at trial that HANO committed an intentional tort, evicted the plaintiffs from their homes or property, denied the plaintiffs access to their homes or property; committed a wrongful entry into their homes or onto their property, or otherwise wrongfully occupied or interfered with their possessory rights or interests in their property. In other words, the plaintiffs failed to demonstrate that HANO committed any of the enumerated offenses listed in the PIL provisions of its policies. Moreover, as indicated in her reasons for judgment, the trial judge found HANO liable based on negligence and strict liability pursuant to La. C.C. art. 2317, but at no time did she find HANO's conduct was intentional.
*718 Although never deeming the language "other invasion of the right of private occupancy" ambiguous, and never identifying any alternate reasonable interpretation of that phrase, and despite never finding any intentional conduct on the part of HANO, the trial court concluded the plaintiffs' claims fall within the definition of "personal injury" under the PIL provision of the policies given "Louisiana's rules of policy interpretation that favor coverage . . ." However, as discussed above, the rule of strict construction against the insurer and in favor of the insured applies only if an ambiguity exists and the ambiguity has two or more reasonable interpretations. In my opinion, not only is there no ambiguity in the contractual provision at issue herein, there are no reasonable alternative interpretations of "other invasion of the right of private occupancy."
Group C offenses for purposes of PIL coverage are "wrongful entry or eviction," as well as "other invasion of the right of private occupancy." Under Louisiana's rules for interpretation of contracts, the latter cannot be construed without reference to the former. Further, applying the doctrine of ejusdem generis[3], the term "other invasion of right of private occupancy" draws its meaning from and is to be construed analogously with the term "wrongful entry or eviction," which clearly requires interference with a possessory interest.
In Regency Motors of Metairie, L.L.C., supra, 03-1312, p. 1, 868 So.2d at 905, the court construed the meaning of "eviction" in a personal injury coverage provision. The court cited Black's Law Dictionary's definition of "eviction" as "`[t]he act or process of legally dispossessing a person of land or rental property'" and "actual eviction" as a "`physical expulsion of a person from land or rental property.'" Id. at p. 6, 868 So.2d at 909. The court also stated that "`wrongful'" is "`characterized by unfairness or injustice . . . contrary to law; unlawful.'" Id. Affirming a summary judgment in favor of the insurer, the court held the insurer did not breach the duty to defend or indemnify the insured under the PIL coverage because "[t]here was no actual impingement on any possessory rights [the plaintiffs] may have had." Id. at 7, 868 So.2d at 909. And in Ledbetter v. Concord Gen. Corp., supra, 564 So.2d 732, the court found coverage was provided under the PIL provision of a policy to an innkeeper who had a duty to maintain a secure premises and to protect against "wrongful entry" arising from a guest breaking into another guest's locked room.
Further, in Louisiana, the term "occupancy" is synonymous with the state of being inhabited (i.e., physical possession of property), and a "right of occupancy" is consistently construed as a right associated with the act of inhabiting (i.e., physically possessing) a premises.[4] Also, coverage *719 for "other invasion of the right of private occupancy" is limited to rights associated with inhabiting the premises, as opposed to using the premises. Appleman at § 131.2[D].
Applying the traditional principles of contract interpretation to the PIL policy provisions of the defendant-insurers' policies, the language "other invasion of the right of private occupancy" is unambiguous and needs no further interpretation. The trial court's conclusion that an "interference with the plaintiffs' reasonable and comfortable use and enjoyment of their property" constituted an "invasion of their right to private occupancy" as contemplated under the PIL provision of the policies is clearly wrong, as a matter of law.
Acknowledging the lack of Louisiana jurisprudence on the issue at hand, the majority, on page 22 of its opinion, states that "[c]ourts in jurisdictions with rules of construction similar to Louisiana's have determined that interference with a right of occupancy constitutes `personal injury' as opposed to `bodily injury' which usually means a physical injury or illness, under the same policy language contained in the `personal injury' coverage portion of the policies in question in this case." I submit that such a statement is circular reasoning, as the issue is not whether an invasion of the "right of (private) occupancy" constitutes an offense under the PIL portion of the policy (clearly it does) but whether an interference with a possessory interest is required in order to constitute the offense of an "other invasion of the right of private occupancy." I believe it is.
I further note that in support of its conclusion that the PIL provisions of the defendant-insurers' policies provide coverage for the plaintiffs' damages, the majority relies on two cases from other jurisdictions, namely, Miller Mutual Ins. Ass'n of Illinois v. Graham Oil Co., 282 Ill.App.3d 129, 218 Ill.Dec. 60, 668 N.E.2d 223 (1996) and Titan Holdings Syndicate, Inc. v. City of Keene, 898 F.2d 265 (1st Cir.1990). I believe those cases are distinguishable from the case at hand because they dealt with an insurer's duty to defend, which is broader than an insurer's duty to indemnify, and because the issue was before the court on a summary judgment or judgment on the pleadings.
In summary, the plaintiffs here stipulated that they sustained no physical bodily injuries or property damages as a result of HANO's actions, and they offered no evidence at trial that HANO committed any of the enumerated offenses in Group C of the PIL provision of the policies. Thus, in the absence of any finding by the trial court that HANO intentionally interfered with the plaintiffs' possessory interests or invaded their rights of private occupancy in their properties, I believe that the plaintiffs' claims for damages for the diminution of their property values and emotional distress *720 are not covered by the PIL provisions of the defendant-insurers' policies.
NOTES
[1] More factual and procedural history on this litigation may be found in Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.App, 4 Cir. 6/27/01), 790 So.2d 734, writ denied, 2001-2215, 2001-2216, 2001-2225 (La.11/9/01), 801 So.2d 378; Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 11/3/04), 890 So.2d 579; Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 2/16/05), 897 So.2d 812; Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir.3/22/06), 929 So.2d 761; and Johnson v. Orleans Parish Sch. Bd., XXXX-XXXX (La.App. 4 Cir. 8/9/06), 938 So.2d 219.
[2] Louisiana Insurance Guaranty Association (LIGA) has been substituted as the proper party for Southern American Insurance Company which is now in liquidation.
[3] 282 Ill.App.3d 129, 218 Ill.Dec. 60, 668 N.E.2d 223 (2d Dist.1996)
[4] 898 F.2d 265 (1st Cir.1990)
[1] As discussed infra, the issue of whether the plaintiffs' claims are covered by the PIL portion, as opposed to the bodily injury or property damage portions of the defendant-insurers' policies, is a matter of first impression in this state. In a case similar to the one at hand, County of Columbia v. Continental Insurance Company, 189 A.D.2d 391, 595 N.Y.2d 988 (1993), the court explained succinctly the distinction between general liability insurance and PIL insurance. At issue in that case was whether a landowner's claim for environmental damage to his real property constituted a "wrongful entry or eviction or other invasion of the right of private occupancy" so as to come within the PIL coverage of the defendants' policies. Explaining the difference between general liability coverage and personal injury coverage, the court stated:

Unlike a general insurance policy, where coverage is stated in very broad terms and subject to clearly defined exceptions (as is the case in the bodily injury and property damage coverage of defendants' policies), the personal injury coverage is "buil[t] from the ground up" [and] affords coverage only for defined risks. As such, coverage is limited to "claims . . . actually arising out of the enumerated . . . torts."
189 A.D.2d at 395, 595 N.Y.S.2d at 991 (citations omitted).
[2] The policies issued by LIGA, U.S. Fire, and National Union contain nearly identical language. The PIL coverage section of Republic's policy, although differently worded, is substantively identical to the PIL coverage sections of the other defendant-insurers' policies.
[3] Black's Law Dictionary 556 (8th ed.2004) defines ejusdem generis as:

A canon of construction that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed. For example, in the phrase horses, cattle, sheep, pigs, goats, or any other farm animal, the general language or any other farm animal  despite its seeming breadth would probably be held to include only four-legged, hoofed mammals typically found on farms, and thus would exclude chickens.
[4] See, e.g., Richard v. Broussard, 495 So.2d 1291, 1293 (La.1986) (where lessor enforces lease by obtaining a money judgment against lessee, the lease remains in effect and lessee retains the right of occupancy); Lichtentag v. Bowens, 256 La. 559, 237 So.2d 377 (1970) ("in eviction proceedings demanding the right of possession or occupancy of real property, the value of the right of occupancy and not the value of the property determines a court's jurisdiction"); Leblanc v. Romero, 00-1233 (La.App. 3 Cir. 2/28/01), 783 So.2d 419 ("occupancy" of property means to reside thereon, and thus contractual right of reversion should vendee cease to "permanently occupy" property was triggered when vendee moved off the property); La. C.C. art. 3412 (occupancy includes the "taking of possession of a corporeal movable"); La. C.C. art. 3418 ("one who has taken possession of an abandoned thing with the intent to own it acquires ownership by occupancy"); La. C.C.P. art. 4702 (requiring written notice when owner of immovable property wishes to evict the "occupant" therefrom, after the purpose of the occupancy has "ceased"); La. C.C.P. art. 4704 ("`Occupant'" includes ". . . any person occupying immovable property by permission or accommodation of the owner, former owner, or another occupant. . . ."); La. C.C.P. art. 4731 (where lessee or occupant has lost his right of occupancy for any reason, the lessor or owner "may cause the lessee or occupant . . . to show cause why he should not be ordered to deliver possession of the premises to the lessor or owner").