Judge Terri F. Love
|, This appeal arises from class action litigation regarding damages suffered by plaintiffs buying property, living, or working on or near’ a former landfill. Having previously adjudicated the class certification and common issues of liability against the housing authority and the City of New Orleans, the trial court began assessing damages to the first flight of non-class representative plaintiffs. The trial court assessed the plaintiffs’ emotional distress damages and awards for diminution in property values. The housing authority and the City of New Orleans appealed the trial court’s judgment contending that the claims were prescribed, awards were improperly calculated, and that workers’ compensation barred some plaintiffs’ recovery.
We find that numerous assignments of error raised on appeal are barred by the doctrine of res judicata. Further, the plaintiffs’ claims were not prescribed, as the suit was filed within one year of the discovery of the contamination. The exclusive remedy of worker’s compensation was untimely raised and does not apply. The plaintiffs proved they suffered from emotional distress, and the trial court did not abuse its discretion in making those awards. The trial court did not commit manifest error by calculating the diminution in property values based on a combination of the expert testimony presented. The defendants were not entitled |2to an offset for payments received by the plaintiffs after Hurricane Katrina because the payments were not duplicative. Accordingly, the judgment of the trial court is affirmed.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs’ complaints arose from working, renting, or owning a home on or adjacent to the Agriculture Street Landfill (“ASL”). Plaintiffs were exposed to toxic materials after the U.S. Department of Housing and Urban Development (“HUD”) approved the development of public and private housing, elderly housing, and businesses on and near a site that the City of New Orleans (“City”) previously leased and utilized as the ASL. Plaintiffs are the first flight of plaintiffs to proceed *458 to trial regarding their emotional distress and property damages claims since the initial liability trial. We previously summarized the facts as follows:
From the early 1900’s until approximately 1958, the City of New Orleans (City) leased more than one hundred acres of, land in the City’s ninth ward for the operation of a municipal landfill and garbage dump. The site, known as the Agriculture Street Landfill (ASL), was bordered by Almonaster Boulevard on the west, Higgins Boulevard on the north, Louisa Street on the east, and the Peoples Avenue Canal .and railroad tracks on the south. In 1965, the City reopened the ASL site for the disposal of massive quantities of debris created by Hurricane Betsy.
In 1967, the City and the Housing Authority of New Orleans (HANO) entered into a cooperative agreement for the development of residential properties in the Desire area of the City. Between ,1969 and 1971, Drexel Development Corporation constructed the Press Park town homes and apartments for HANO. No remediation or special site preparation was done before Press Park was constructed. In 1971, HANO purchased the completed Press Park project from Drexel and has owned and operated the site since that time. Some Press Park tenants participated in a “turn key” program, whereby a portion of their monthly rent was placed in an escrow account and applied toward the purchase of their town home unit. When their escrow account reached the amount needed for purchase of the unit, HANO ^transferred title of the unit to the tenant. HANO never advised any of the' prospective' Press Park tenants or home buyers that the site had once been a part of the City’s landfill.
In the late 1970s, the City performed soil testing in the Gordon Plaza area of the ASL neighborhood, in anticipation of the construction- of the Gordon Plaza single-family homes. As a result of the soil testing, the City required the developers of Gordon Plaza to add topsoil before constructing the homes. In 1980, sixty-seven ’ family homes comprising Gordon Plaza were built. The Gordon Plaza home buyers were not told that their homes were located on 'what had once been a part of the City’s landfill.
In 1975, the Orleans Parish School Board (School Board) purchased a tract of land along Abundance Street in the ASL neighborhood, with the intent to build an elementary school. In 1984, the School Board began plans for construction of Moton Elementary School on the site. Because the School-Board knew when it purchased the property that the site had once been a part of the City’s landfill, the School Board hired engineering firms to conduct an environmental evaluation of the property. Environmental testing on the site identified the presence of numerous toxic and hazardous materials, including lead, arsenic, mercury, and polycyclic aromatic hydrocarbons. Because of the presence of the toxic and hazardous materials, the School Board hired several environmental consultants to advise them on how the site could be remediated to eliminate the danger of harmful exposures created by the presence of hazardous materials. The environmental consultant's recommended that the entire site be excavated to a depth of three feet, with the top three feet of contaminated soil removed and' replaced with two feet of clean topsoil. Between the clean topsoil and the hazardous materials, the consultants recommended that a layer of six inches to one foot of impermeable clay be placed over the entire site. In 1986-87, Moton Elementary School opened for *459 kindergarten through sixth grade with an enrollment of approximately nine hundred students. The School Board did .not tell its employees or the parents of the students that the school had been built on a part of .the .City’s former landfill or that environmental testing had identified the presence of toxic materials on the site. During the 1991-92 school-year, there were plumbing problems at Moton Elementary which required under-slab construction and repairs. This necessitated the construction of a trench and the breach of the three-foot layer of clean topsoil.
I/The Environmental Protection Agency (EPA) tested the soil in parts of the ASL neighborhood in 1986 to determine whether the ASL site was contaminated. The residents were not given the results of the EPA’s 1986 soil tests nor were they told that their property was contaminated or given any special instructions to follow or precautions to take to protect themselves from exposures to the soil. Between 1985" and 1986, the Louisiana Department of Health and the Agency for Toxic Substance Disease Registry (ATSDR) conducted a public health screening of children in the ASL neighborhood to determine whether there was an increased incidence of elevated blood lead levels. The residents were never told that their children had been exposed to excess levels of lead, nor were they given any special instructions or precautions to follow to protect their children from exposures to the soil.
In 1998, the EPA came back to the ASL site and conducted more Soil tests throughout the neighborhood. The tests indicated that the soil was contaminated with more than one hundred forty toxic and hazardous materials, more than forty of which are known to cause cancer in humans. The EPA told the ASL residents to take special precautions to protect themselves from any exposure to the soil. In 1994, the EPA placed a portion of the ASL neighborhood on the National Priorities List and later that same year it declared that the ASL site was sufficiently contaminated to be named a Superfund site. Later that same year, the School Board closed the •Moton Elementary School campus and the ASL residents formed the Concerned Citizens of the Agriculture Street Landfill, Inc. to qualify for federal grant funding to pay for the services of an environmental technical advisor.
In the-mid-1990s, the EPA proposed a remediation, plan for the ASL site that .would remove and replace the.top two feet of. soil, where possible, with a semipermeable barrier between the- .dean topsoil and the contaminated soil. The soil under buildings and the streets would not be disturbed. The ASL residents opposed the EPA’s plan as being inadequate to remediate the site. The ASL residents supported an alternative voluntary relocation/buy-out plan. The EPA rejected the requests of the ASL residents and from 2000-2001, the EPA financed a $20,000,000.00 remediation project. In the remediation process, approximately two feet of soil was removed from around houses and buildings where possible. Due to underground utilities, water lines, etc., only one foot of soil was removed in some areas. After the EPA completed the remediation work, the ASL residents were given a certificate of completion ’|f,confirming that their property had been partially remediated. The EPA also gave'the ASL residents a list of permanent restrictions on the use of their property and advised the ASL residents that they were responsible for maintaining the integrity of the clean layer of topsoil and the felt-like material that comprises the semi-permeable bar *460 rier between the clean layer of topsoil and the ground below.
Not satisfied with the steps taken to correct the problems with the ASL neighborhood, a number of the residents proceeded with a class action lawsuit. The named defendants in the action include the City, HANO, the School Board, and HANO’s insurers, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, U.S. Fire Insurance Company, Republic Insurance Company, and South American Insurance Company/Louisiana Insurance Guaranty Association. The plaintiff class has previously been defined as follows: 1) current and former residents who have lived on the site of the former landfill, as defined as the area bounded on the north by Higgins Blvd., on the east by Louisa Street, on the south by Florida Avenue and on the west by Al-monaster Avenue and the Peoples Avenue Canal, for at least twelve months prior to February 1, 1994; 2) current and former business owners and their employees who have operated a business on the former landfill site, as described above, for at least twelve months prior to February 1, 1994; 3) current residents who are the owners of record of their homes, or who are buying their homes but have not yet completed their payments; and 4) former students and employees of Moton Elementary School who attended or worked at the school on the site of the former landfill for at least twelve months or one school year prior to February 1,1994.
Johnson v. Orleans Par. Sch. Bd., 06-1223, pp. 1-6 (La.App. 4 Cir. 1/30/08), 975 So.2d 698, 703-05 (“Johnson VI”).[2]
The trial court conducted a common issues and liability trial that also adjudicated the nine class representatives’ damages claims. “The trial court found |fithe City (50%), HANO (50%) and their insurers liable jointly and in solido to the members of the first three sub-classes.” Johnson VI, 06-1223, p. 6, 975 So.2d at 705. “The trial court found that the city was negligent in its actions and inactions that resulted in the conversion of its own former municipal landfill into a residential area that the EPA deemed unreasonably dangerous in 1994.” Id., 06-1223, pp. 7-8, 975 So.2d at 706. “This finding was based on Civil Code Article 2315 as it existed prior to 1980.” Id. “HANO was found negligent under Civil Code Article 2317 as it existed prior to 1980.” Id.
On appeal, we reduced the trial court’s awards for emotional distress damages by 50% and affirmed the remainder of the judgment. Johnson VI, 06-1223, p. 24, 975 So.2d at 714. The Louisiana Supreme Court denied the seven writs sought. Johnson v. Orleans Par. Sch. Bd., 08-0607 (La. 6/27/08), 983 So.2d 1289, and writ denied, 08-0664 (La. 6/27/08), 983 So.2d 1289, and writ denied, 08-0671 (La. 6/27/08), 983 So.2d 1289, and unit denied, 08-0672 (La. 6/27/08), 983 So.2d 1290, and writ denied, 08-0673 (La. 6/27/08), 983 So.2d 1290, and writ denied, 08-0674 (La. 6/27/08), 983 So.2d 1290, and unit denied, 08-0675 (La. 6/27/08), 983 So.2d 1291, and unit denied, 08-0682 (La. 6/27/08), 983 So.2d 1291. The United States Supreme *461 Court also subsequently denied cert. Nat’l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Allen, 555 U.S. 1085, 129 S.Ct. 768, 172 L.Ed.2d 756 (2008).
The damages trial for the first flight of 65 non-class representative plaintiffs commenced in 2013. Following a lengthy bench trial, the trial court dismissed four plaintiffs’ claims for their failure to appear at trial. The trial court issued a lengthy judgment, which was later amended after motions for new trial were filed. The trial court denied the defendants’ claims of prescription, and found that the 17affirmative defense of worker’s compensation was untimely raised, as it was raised, for the first time in 20 years, at trial. The trial court awarded the remaining plaintiffs damages for emotional distress. Further, the trial court made awards for diminution in property values utilizing present day values for Gordon Plaza residents, and pre-Hurricane Katrina values for Press Park townhome owners. HANO and the City’s (collectively “Defendants”) suspensive appeals followed.[3]
The Defendants contend that the trial court erred by finding that the plaintiffs’ claims were not prescribed, erred by awarding/calculating emotional distress damages, and that the calculations for the diminution of property awards were flawed. The Defendants also assert that the trial court erred by not assigning fault to anyone other than them, holding them solidarity liable, and holding them liable for damages caused by Hurricane Katrina.

STANDARD OF REVIEW

Factual determinations are reviewed using the manifest error/clearty wrong standard of review. Hall v. Folger Coffee Co., 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98. This “precludes the setting aside of a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety.” Id. “[A] reviewing court may not merely decide if it would have found the facts of the case differently.” Id. “Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous).” Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978). “Accordingly, if an appellate court concludes that the trial court’s factual findings are clearly wrong, lathe mere fact that some record evidence appears which would furnish a reasonable factual basis for the contested findings does not require affirmance.” Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987).
Additionally, “[w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearty wrong standard demands great deference to the trier of fact’s findings.” Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). “[0]nty the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Id. “Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness.” Id., 549 So.2d at 844-45. “[Wjhere such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that *462 finding can virtually never be manifestly erroneous or clearly wrong;” Id., 549 So.2d at 845.
“Although appellate courts must accord great weight to the factual findings of the trial judge, these same courts have a duty to determine if the fact finder was justified in his conclusions.” Mari, 505 So.2d at 1127. Further,
[a]n appellate court is not required, because of the foregoing principles of appellate review, to affirm the trier of fact’s refusal to accept as credible un-contradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles.

Id.

“However, when a legal error has restricted or interdicted the fact-finding | flprocess, the abuse of discretion standard no longer applies, and we apply a de novo standard of review.” Provosty v. Arc Constr., LLC, 15-1219, p. 7 (La.App. 4 Cir. 11/2/16), 204 So.3d 623, 629. “A legal error exists upon the application of incorrect principles of law that deprives a party of substantial rights.” Id.
When reviewing questions of law, 'appellate courts use the de novo standard. Harold A. Asher, CPA LLC v. Haik, 12-0771, p. 5 (La.App. 4 Cir. 4/10/13), 116 So.3d 720, 724. Mixed questions of law and fact are reviewed with the manifest error standard of review. Barrois v. Panepinto, 13-0577, p. 3 (La.App. 4 Cir. 1/8/14); 133 So.3d 36, 38.

RES JUDICATA

The Defendants raise numerous assignments of error that ,the plaintiffs contend are precluded because of res judi-cata. As the. plaintiffs’ argument is meritorious, we address these matters first.
“The civilian concept of res ju-dicata is based upon a presumption of correctness.” Burguieres v. Pollingue, 02-1385, p. 7 (La. 2/25/03), 843 So.2d 1049, 1053. “The doctrine of res judicata precludes re-litigation of claims and issues arising out of the same factual circumstances when there is a valid final judgment.” Myers v. Nat’l Union Fire Ins. Co. of Louisiana, 09-1517, p. 5 (La.App. 4 Cir. 5/19/10), 43 So.3d 207, 210. “It promotes judicial efficiency and final resolution of disputes.” Ave. Plaza, L.L.C. v. Falgoust, 96-0173, p. 4 (La. 7/2/96), 676 So.2d 1077, 1079. La. R.S. 13:4231 provides:
Except as otherwise provided by law, a valid and final judgment .is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter [1nof the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars ,a subsequent, action on those causes of action.
(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
“Res judicata cannot be invoked unless all its essential elements are present and each *463 necessary element has been established beyond all question.” Myers, 09-1517, p. 6, 43 So.3d at 211.
In regards to class actions, “[a] definitive judgment on the merits rendered in a class action concludes all members of-the class, whether joined in the action or not, if the members who were joined as parties fairly insured adequate representation of all members of the class.” La, C.C.P. art. 597.
The present appeal pertains to the damages trial of the first flight of non-class representative plaintiffs in the ASL class action. The previous common issues trial determined liability and methods of awarding emotional distress damages. The parties are identical: the defendants and members of the certified class. The Louisiana Supreme Court denied writs, and the United States Supreme Court denied cert. Accordingly, we find that the holdings from the first trial bar reconsideration of the Defendants’ following assignments of error: 1) the trial court erred in using a formula for awarding emotional distress damages,[4] 2) the trial court did not consider comparative fault of other parties, and 3) the trial court erred in holding HANO and the City solidarily liable.

^PRESCRIPTION

The trial court found that the class members’ claims were timely filed on August 31, 1993. The Defendants contend that the trial court erred 'by finding that the plaintiffs’ claims were not prescribed, as many of the 61 plaintiffs had -some degree of knowledge about a landfill or city dump.
“[P]rescription is defined as a means of acquiring real rights or of losing certain rights as the result of the passage of time.” Taranto v. Louisiana Citizens Prop. Ins. Corp., 10-0105, p. 5 (La. 3/15/11), 62 So.3d 721, 726, “[T]he fundamental purpose of the prescription statutes is ‘to afford a defendant economic and psychological security if no. claim is made timely and to protect the defendant from stale claims and from the loss, or non-preservation of relevant proof.’” Id., 10-0105, p. 6, 62 So.3d at 726, quoting Cichirillo v. Avondale Indus., Inc., 04-2894, 04-2918, p. 9 (La. 11/29/05), 917 So.2d 424, 430.
“Prescription runs against all persons unless exception is established by legislation.” La. C.C. art. 3467. “Prescription begins to run when it is determined that damage was sustained.” Landry v. Blaise, Inc., 02-0822, p. 4 (La.App. 4 Cir. 10/23/02), 829 So.2d 661, 664. “Damage is sustained, for purposes of prescription, only when -it has manifested itself with sufficient certainty to be susceptible to proof, in a court of justice.” Id., 02-0822, p. 4, 829 So.2d at 664-65. “Liberative prescription on the claims arising out of the transactions or occurrences described in a petition brought on behalf of a class is suspended on the filing of the petition as to all members of the class as defined or described therein.” La. C.C.P. art. 596.
However, Louisiana has developed “the jurisprudential doctrine of contra non valentem as an exception to this statutory rule.” Marin v. Exxon Mobil Corp., 1209-2368, 09-2371, p. 11 (La. 10/19/10), 48 So.3d 234, 245, The four situations wherein contra non valentem may apply are:
(1) where there was some legal cause which prevented the courts or their offi *464 cers from taking cognizance of or acting on the plaintiffs action;
(2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or
(4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiffs ignorance is not induced by the defendant.
Id., 09-2368, 09-2371, p. 12, 48 So.3d at 245. “[T]he Louisiana Supreme Court has cautioned that the doctrine only applies in exceptional circumstances.” Felix v. Safeway Ins. Co., 15-0701, p. 5 (La.App. 4 Cir. 12/16/15), 183 So.3d 627, 630. “[Pjrescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable.” Johnson VI, 06-1223, p. 11, 975 So.2d at 708.
While the first three scenarios do not apply to the present matter, the trial court and the Johnson VI court found, and, we agree, that the fourth category known as the discovery rule applies to the plaintiffs’ claims. After reviewing the plaintiffs’ trial testimony, the trial testimony of family members of the deceased, and the depositions of those plaintiffs deceased or unavailable, nothing indicates that the plaintiffs knew or should have known that the land they lived or worked on contained numerous dangerous and hazardous toxins, some of which have been shown to cause cancer. The trial court aptly summarized the facts surrounding prescription of the plaintiffs’ claims as follows:
the Plaintiffs were given no information about the true nature of their neighborhood before they purchased their | ^property or moved to the Site as a tenant.
From 1984 through 1993 the residents were told by various governmental agencies—the EPA, the ATSDR, the Louisiana Department of Environmental Quality, the Louisiana Department of Health, the School Board—that their neighborhood was safe. During this same period of time, the City and HANO were publicly silent. In fact, the City and HANO claim that they did not know the property is [sic] contaminated until 1993.
Although there were some environmental investigations in the ASL neighborhood in the mid-1980s, the Plaintiffs were not given sufficient information such that they should have known that their properties were contaminated or that they were in danger. Until the late part of 1993, no one told any of the Plaintiffs that their health was at risk, or that they should take any special precautions to protect themselves from exposure to the soil in their own properties.
This trial afforded the Court the opportunity to observe and judge the credibility of the Plaintiffs as they testified on the subject of when they first learned that their property was contaminated. The Plaintiffs were subject to rigorous, intense cross examination by defense counsel. The Court is impressed with the sincerity of these Plaintiffs, and is convinced that they did not know, nor could they reasonably have known, until at least sometime in 1993 that their neighborhood is contaminated.
The Court acknowledges that, before they moved to the ASL site, some of the Flight 1 Plaintiffs knew, by virtue of having lived in the “Desire Housing” area or the area adjacent to the ASL site, that the City had once operated a garbage dump or landfill somewhere in *465 the ASL neighborhood. But, for unsophisticated' citizens like these, having knowledge that there was once a garbage dump (which to most meant nothing more than ordinary “household garbage”) somewhere in the vast ASL acreage does not satisfy the legal standard for “knowing” the true nature of the toxic and hazardous materials that the City was dumping and/or permitting to be dumped on the ASL site. .
In fact, throughout the 20-year history of this case, the municipal Defendants, the City, HANO, and the Orleans Parish School Board, have maintained that— until the EPA declared a portion of the ASL neighborhood to be a “Superfund site” in 1994—they did not know the existence, nature, and/or extent of the contamination of the ASL site. It would be folly for this or any Court to hold the unsuspecting and unsophisticated Plaintiffs to a higher standard of knowledge than the municipal | ^agencies that created this environmental disaster in the first place. Furthermore, given the vast size of the ASL neighborhood, there was no competent evidence introduced at trial establishing that any Flight 1 Plaintiff knew or should have known that his or her specific property, lot, house, apartment, or town house was actually located directly on top of the former “dump”.
The Court also finds that the Defendants should not benefit from their own silence. During the same period of time—the mid-1980s—the Defendants claim they knew nothing about the contaminated condition of the soil or the hazardous materials to which the Plaintiffs were being exposed on a daily basis. Nevertheless, the Defendants claim that somehow the Plaintiffs, who are ordinary citizens with no special education or scientific training (only a few have formal education beyond high school), should have been able to acquire knowledge superior to that of the City (which had its own Health Department and its own Office of Environmental Affairs), HAND,' the Louisiana Department of Health, the Louisiana Department of Environmental Quality, the Agency for Toxic Substance and Disease Registry (ATSDR), and the EPA.
The Court is, therefore, still satisfied that if any of the Flight 1 Plaintiffs had known the true condition of the ÁSL site before they purchased their properties they would not have agreed to buy property there, move there, work there, or send their young children to school there.
The Defendants did not carry their burden of proof on this affirmative defense as to any of the Flight 1 Plaintiffs.
Furthermore, as stated by the Johnson VI court, “[i]f- we are to assume that these defendants, who were in a superior position as to know what was going on, were not overly concerned about any potential harm or injury to the plaintiffs, we must assume the same for the plaintiffs.” Johnson VI, 06-1223, pp. 11-12, 975 So.2d at 708, The plaintiffs all testified that they learned of the contamination around 1993-1994, within one year of filing suit. Accordingly, following our , de novo review, we find no error in the trial court’s finding that, the plaintiffs’ claims were not prescribed.

^WORKER’S COMPENSATION

The Defendants assert that the trial court erred by awarding damages to three of the sixty-one plaintiffs who were former HANO employees or statutory employees. The Defendants aver that worker’s compensation statutes provide the exclusive remedy for those plaintiffs.
The trial court stated that the Defendants never raised worker’s compensation *466 as an affirmative defense until, the trial for the first flight of plaintiffs, , which was twenty years after litigation began. Therefore, the trial court found that the assertion of worker’s compensation as an exclusive remedy was barred as untimely.
“[T]he tort immunity provided by the [worker’s compensation] Act operates as an affirmative defense; it is not a law evaluating conditions of legality of defendant’s conduct but, rather, serves as a vehicle for asserting a substantive defense that defeats an otherwise viable claim.” Brown v. Adair, 02-2028, p. 5 (La. 4/9/03), 846 So.2d 687, 690. See also La. C.C.P. art. 1005. “[T]he employer bears the burden of proving entitlement to the immunity.” Weber v. State, 635 So.2d 188, 191 (La. 1994). Failure to timely raise such an affirmative defense may result in the waiver of said defense to avoid trial by ambush. Teasley v. Ates, 03-824, p. 5 (La.App. 3 Cir. 12/10/03), 861 So.2d 778, 781.
Nothing in the- record on appeal demonstrates that worker’s compensation was raised in an exception or pled as an affirmative defense prior to the first trial or before the current damages trial for the first flight of plaintiffs. Given that worker’s compensation as an exclusive remedy was not raised until day seven of the trial, some twenty years after the start of litigation, we find that the trial court did not err in finding the defense was untimely raised.
| ^Notwithstanding the untimeliness, the exclusive remedy of worker’s compensation fails. The Defendants claim that worker’s compensation barred an award of damages to plaintiffs: McArthur Samuels, Jr., Jacquelyn Bates, and Eddi-son Johnpire, Sr. Mr. Samuels, Jr. was employed by the Press Park Community Development However, his claims were based on his ownership of a Gordon Plaza home- and .the emotional distress he suffered as a result. Ms. Bates was a direct employee of HANO part-time after school in junior high school and high school. Yet again, however, her claims were based upon her later ownership of a Gordon Plaza home and the resulting emotional distress. As such; the. claims of Mr. Samuels, Jr. and Ms. Bates were not related to their employment. Mr.; Johnpire, Sr. worked for the Press Park Homebuyers’ Association for approximately twenty-two years. He was not a HANO employee. HANO did not present evidence,-nor proffer evidence, to establish that Mr.-Johnpire, Sr. was a statutory employee of HANO. Accordingly, worker’s compensation does not apply.

EMOTIONAL DISTRESS

Even though we found that the Defendants’ assertion that the trial court erred in its method of awarding emotion distress damages was barred due to res jv4icata, the Defendants nonetheless also contend that the plaintiffs did not meet their.burden of proving they suffered from emotional distress. The Defendants also maintain that the law regarding the required proof for emotional distress damages has changed since the initial trial on liability and for the class representatives.
“The legal standard for the recovery of negligent- infliction of emotional distress absent physical injury is that the plaintiff must show an ‘especial 117likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.’ ” Lester v. Exxon Mobil Corp., 12-1709, p. 8 (La.App. 4 Cir. 6/26/13), 120 So.3d 767, 774, quoting Bonnette v. Conoco, Inc., 01-2767, pp. 22-23 (La. 1/28/03), 837 So.2d 1219, 1234. “The jurisprudence, however, has .limited such recovery by requiring that the emotional distress be severe and not merely the result of the usual worry or anxiety attend *467 ant to property damage.” Johnson VI, 06-1223, p. 18, 975 So.2d at 711. “In Doerr v. Mobil Oil Corp., 2004-1789 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, this Court allowed recovery of damages for emotional distress suffered by plaintiffs that was caused not by the usual worry or anxiety associated with property damage, but legitimate concern about health effects.” Id. In Doerr, plaintiffs “who suffered.no physical injury resulting from contamination of the parish water supply due to oil refinery discharge were entitled to damages, for negligent infliction of emotional distress” because they “had legitimate concerns regarding the health effects of the contamination and took actions such as drinking only bottled water or installing filtration systems and checking the odor and color of the water at each use to test for further contamination.” Id.
While none of the sixty-one plaintiffs sought professional help for their emotional distress related to owning, living, or working on property contaminated by the ASL, all of the plaintiffs, via live testimony or deposition, explained their emotional distress in dealing with the repercussions of the ASL. This included their apprehension regarding gardening, entertaining outside, and allowing their children to play outside. The plaintiffs all testified as to how long they lived or worked on the site.
The trial court’s findings were as follows:
| isThe Court finds as a matter of fact and law that the Flight 1 Plaintiffs who lived or worked directly on the ASL site (that portion of the ASL neighborhood located within'the EPA’s 1994 “Superfund” boundaries) have suffered mental and emotional distress due to the shocking realization in 1994 that their homes and businesses were located on a “Superfund Site”. These Plaintiffs began to suffer extreme stress in 1994, when the EPA first published its findings from soil testing at the ASL site, and placed the site on the National Priorities List (“NPL”). '
The Court finds that to this day, and even given "the trauma, displacement, and loss suffered to varying degrees during and as a result of Hurricane Katrina, each of the Flight 1 Plaintiffs continues to be adversely affected emotionally by their knowledge that for many years they each lived or worked every day directly on top of one of the most contaminated sites in the United States.
■ The Court, therefore, holds that their emotional distress arose from and is proportional to their years of exposures to the toxic and hazardous materials that contaminate the ASL site.
The Court finds as a matter ,of fact ■and law that the stress suffered by the Flight 1 Plaintiffs is of a type that is so unique and extraordinary in nature that it is not merely speculative, but is real and compensable. Although there is no evidence of any Plaintiff having been diagnosed with a bodily injury or disease that has been medically related to the contaminated soil, the Court finds that the actual and extensive damage occurring to the Plaintiffs’ property since 1972 has been clearly established. .. .
In 2000-2001', the EPA performed a partial remediation ■ of approximately 10% of the ASL site. The contaminants at the very surface of a portion of the ASL site were excavated and replaced with clean soil, (there was no excavation of the contaminated soil under the streets or under any homes or buildings), and a semi-permeable barrier was installed between the" clean topsoil and the contaminated soil that is just 2’ below the surface (less than 2’ in some areas due to the presence- of under *468 ground utilities, water lines, phone lines, drainage, etc.).
The Court holds that it is reasonable for each Flight 1 Plaintiffs emotional distress to be directly proportional to the length of time he or she lived or worked on the ASL site prior to the year 2001, and were thereby exposed on a daily basis to the hazardous and toxic materials that were at the surface of their properties and at a depth of 20’ in the soil. The Court further holds 113that these daily exposures to hazardous materials from 1972 through 2001 constitute an “occurrence” of a “personal injury” as those terms are defined in Louisiana. The Court also notes that, as was the case at the 2005 trial, none of the Defendants called even one witness to challenge any of the Flight 1 Plaintiffs testimony about how living on the ASL site has affected them emotionally since 1994, and continues to affect them today. Nor did the Defendants introduce any documents that effectively rebut any of the Plaintiffs’ testimony. The Court was impressed by the genuine testimony of each Flight 1 Plaintiff, who expressed in his or her own words why and how he or she is still haunted by the knowledge that he or she lived on an un-remediated “Superfund site” for years. The Court, on January 12, 2006, established a formula for calculating the damages that will fairly compensate the Class Members, including these Flight 1 Plaintiffs, in an amount that is directly proportional to their years of residence. Having watched and listened to each of the Flight 1 Plaintiffs testify live at trial, the Court is convinced that the 2006 formula is still fair and appropriate. Therefore, the Flight 1 Plaintiffs who lived or worked directly on the ASL site should be compensated for their mental and emotional distress as follows:
For 1- up to 5 years $2,000 (per year)
For 5- up to 10 years $12,500.00 (total)
For 10- up to 15 years $15,000.00 (total)
For 15- up to 20 years $20,000.00 (total)
For 20 years or more $25,000.00 (total)
The Court notes that since each Flight 1 Trial Plaintiff had the burden of proving his or her actual dates of residency, the Court reduced the award of any Plaintiff whose testimony was contradicted by the documentary evidence entered into the Record.
The trial court judge was in the best position to weigh each plaintiffs credibility. In addition, the plaintiffs testified as to whether they owned or rented property on or adjacent to the ASL and whether they just worked on the ASL. The trial court then awarded emotional damages in accordance with the methods established at the initial trial. The Louisiana Supreme Court subsequently denied writs and the | gpUnited States Supreme Court denied cert.[5] Therefore, we do not find that the trial court erred by finding that the plaintiffs proved they suffered from emotional distress related to the ASL. Further, as stated above, the amounts awarded coin *469 cided with the methods previously established and upheld.

PROPERTY VALUE AWARDS

The Defendants contend that the trial court erred by accepting the plaintiffs’ real estate expert and by finding that the properties possessed a permanent stigma.
The plaintiffs’ expert appraiser, Kermit Williams, testified regarding his methods for valuing the properties located on or adjacent to the ASL. Mr. Williams possessed experience with properties affected by stigma or environmental problems. He stated that all of the ASL properties suffered stigma damage due to the incurable defect of being located on top of the ASL. Additionally, Mr. Williams testified that the land-use restrictions further increased that stigma for properties on the ASL. Mr. Williams stated that the properties located on the ASL suffered from a permanent stigma, while the stigma attached to adjacent properties would decrease in twenty to thirty years. Overall, he estimated an approximate 25% decrease in the Gordon Plaza property values based on the environmental stigma.
Jimmy Thorns, a 'real estate appraiser called by the Defendants, did not possess expert experience in stigma or environmental damages, but testified that the properties were valued 12.5% lower than other comparable properties.
The Defendants’ real estate analyst, consultant, and appraiser, Richard Roddewig, testified that he was an expert analyst on the effects of environmental 121 contamination and environmental stigma on property value. Mr. Roddewig relied upon the appraisals of Mr. Thorns. He explained his methodologies for comprising his devaluation figures to the trial court and calculated a range of between 10 - 15% stigma: 10% for remediated homes and 15% for non-remediated homes. Further, he assigned a 6-12% stigma impact on shell/gutted properties and 5% for properties adjácent to-the ASL. Mr. Rod-dewig stated that the impact on the properties was- temporary and that it would decrease in the future. However, he could not opine as to how long it would take for the decrease to occur.
The trial court found that the plaintiffs’ properties were only partially remediated by the EPA, and that the contaminants remain below the protective layer of soil, where there is a protective layer. The trial court further found that the land-use restrictions, the association with a “Superfund site,” and the “continuing presence of toxic and hazardous materials directly under the Plaintiffs’, homes” combined “to reduce the value of the Plaintiffs’ properties below that of comparable, but unimpaired- properties, in the New Orleans area.”
Furthermore, after considering all of the expert testimony, the trial court concluded that the Gordon Plaza homes suffered a 20% loss in the present-day value, which was “entirely due to the ongoing, ever-present contamination of 'the soil in the ASL site.” The trial court found that the 20% valuation was a reasonable compromise between the values presented by the experts.
As for the Press Park properties, the trial court averaged the appraisers’ pre-Katrina values for each property and awarded 20%. The trial court utilized the pre-Katrina valuations because HANO has prevented the Press Park townhome own-ersjjgfrom entering and rebuilding their property.[6] The Press Park townhomes remain fenced off, blighted, and inaccessible.
*470 The trial court held that the adjacent properties “suffered a continuing diminution of value in their properties, due to the stigma associated with their close proximity (some as close as directly across the street) -to the ASL site.” The trial court averaged the values from the appraisers and awarded 10% of the average value.
The trial court arrived at the above-discussed conclusions after weighing the experts’ testimony and conducting painstaking calculations for each plaintiff homeowner. The Defendants disagree with the method and analysis used by Mr. Williams. However, the trial court determined that the experts’ calculations were all reasonable. Accordingly, the trial court averaged the figures and awarded a percentage of damages between the experts’ percentages. As such, we do not find that the trial court committed manifest error by weighing the experts’ testimony and choosing to award damages for the diminution in property values based on a combination of the experts’ calculations.

J^HURRICANE KATRINA DAMAGES

The Defendants contend that they were “entitled to offsets for the Road Home and insurance payments received by the plaintiffs” because the payments served as a double or triple payment. This argument lacks merit.
The payments received by plaintiffs after Hurricane Katrina were not for the same damage caused by the Defendants. As stated by the trial court:
All of these post-Katrina payments were for structural damage caused above ground by wind and/or flooding. None of these payments were designated, designed, or stated to be for anything other than the wind and/or flood damage caused specifically and exclusively by Hurricane Katrina.
None of the payments were duplicative. Therefore, the Defendants’ assignment of error has no merit.

DECREE

For the above-mentioned reasons, we find that the Defendants’ assignments of error regarding the formulaic calculation of emotional distress damages,, comparative fault, and solidary liability are barred by the doctrine of res judicata. The Plaintiffs’ claims were not prescribed because the testimony demonstrates that they discovered the contamination within one year of filing suit. The exclusive remedy of worker’s compensation was untimely raised and is inapplicable. The trial court did not err by finding that the plaintiffs proved emotional distress or abused its discretion in calculating the amount of damages. Further, the trial court did not commit manifest error by calculating dam *471 ages for property diminution in value based on a combination of the experts’ testimony. The trial court was also not clearly wrong for using the pre-Katrina values for determining the damage to the Press Park townhomes. Lastly, the Defendants were not entitled to an offset for Road Home and insurance payments received by the Plaintiffs after Hurricane | ^Katrina because the payments were not duplicative. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED

. Additional background on this litigation is contained in Johnson v. Orleans Par. Sch. Bd., 00-0825, 00-0826, 00-0827, 00-0828 (La. App. 4 Cir. 6/27/01), 790 So.2d 734 ("Johnson I"); Johnson v. Orleans Par. Sch. Bd., 03-0828, 03-1573 (La. App. 4 Cir. 11/3/04), 890 So.2d 579 ("Johnson II"); Johnson v. Orleans Par. Sch. Bd., 04-1352 (La.App. 4 Cir. 2/16/05), 897 So.2d 812 ("Johnson III"); Johnson v. Orleans Par. Sch. Bd., 05-0796 (La. App. 4 Cir. 3/22/06), 929 So.2d 761 ("Johnson IV”); and Johnson v. Orleans Par. Sch. Bd., 05-1488 (La. App. 4 Cir. 8/9/06), 938 So.2d 219 (“Johnson V").

. National Union Fire Insurance Company and United States Fire Insurance Company, two of HANO's insurers, also filed appeals that were dismissed upon their own motion.

. This Court also notes that the method for awarding emotional distress damages was affirmed as amended by this Court in Johnson VI, and writs were denied by the Louisiana Supreme Court.

. The awards included in the trial court’s January 12, 2006, judgment were reduced by 50% by this Court in Johnson VI, 06-1223, 975 So.2d 698. The amounts awarded are the amounts as amended by this Court.

. The Defendants contend that the trial court erred by utilizing the pre-Katrina valuations *470 to calculate the award to Press Park town-home owners. However, HANO has prevented the owners from rebuilding or returning to their properties. As the trial court noted:
The present blighted condition of the Press Park town homes is through no fault of the Flight 1 Press Park Plaintiffs ... but is due solely to the actions of HANO. Furthermore, the Court notes that HANO did not call any witnesses at trial, or offer any documents into evidence, to explain its ' post-Katrina actions.
Therefore, the Court will not penalize the Flight 1 .Press Park town home owners by using the present date as the "effective date” for the appraised values of the Press Park town homes. Instead, the Court will use the pre-Katrina, unimpaired values of thé Press Park town homes upon which to base the Court's decision about the stigma damages incurred for each of these properties.
We agree with the trial court. The Defendants should not benefit from their own actions following the destruction of Hurricane Katrina. Thus, the trial court did not commit manifest error by using the pre-Katrina valuations for the Press Park townhomes.