| LUIGI MALTA, INDIVIDUALLY AND ON BEHALF OF HIS MINOR CHILD, GIOVANNI MALTA | * | NO. 2020-CA-0250 |
|---|---|---|
| | * | COURT OF APPEAL |
| | * | FOURTH CIRCUIT |
| VERSUS | * | STATE OF LOUISIANA |
| | * | |
| HERBERT S. HILLER CORPORATION, HILLER OFFSHORE SERVICES, INC., THE HILLER COMPANIES, INC., HELIS ENERGY, L.L.C. AND HELIS ENTERPRISES, INC. | * | |
| | * | |
| | * * * * * * * | |

*DLD*

**DYSART, J., CONCURS IN PART AND DISSENTS IN PART.**

I agree with the majority as to the award of damages and the denial of the Motion to Dismiss the Appeal. I also agree that the language in the amended judgment is ambiguous with respect to the award for past medical expenses and should be amended for clarification. I respectfully dissent, however, as to the assessment of 100% fault for the accident against Hiller, although I agree with the majority that Helis is without liability in this action. While our jurisprudence indicates that a trial court's judgment should not be reversed in the absence of manifest error, it also reflects that:

> "[A] reviewing court may not merely decide if it would have found the facts of the case differently." [*Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98]. "Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous)." *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La. 1978). "Accordingly, if an appellate court concludes that the trial court's factual findings are clearly wrong, **the mere fact that some record evidence appears which would furnish a reasonable factual basis** for the contested findings does not require affirmance." *Mart v. Hill*, 505 So.2d 1120, 1127 (La. 1987).

1

*Johnson v. Orleans Par. Sch. Bd.*, 14-0277, pp. 7-8 (La. App. 4 Cir. 4/26/17), 219 So.3d 452, 461, *writ denied*, 17-0907 (La. 9/29/17), 227 So.3d 290. (Emphasis added). I agree that the record contains *some* "evidence. . . which would furnish a reasonable factual basis" for the trial court's assessment of fault; however, in my view, the testimony and exhibits, and the totality of the circumstances of this case, support a finding that Wood Group and Mr. Malta both bear fault. Thus, in my opinion, the trial court manifestly erred in determining that Hiller was solely at fault.

Hiller was retained to perform annual inspections of Helis' Black Bay facility. Its job was, simply, "[t]o do the inspection;" as James Guidry, Hiller's operational manager who arranged inspections, testified, "[Hiller] inspect[s] it, and it's up to the customer to maintain it. It's their . . . equipment; it's not [Hiller's] equipment." This was also confirmed by Dray Hebert, the Hiller technician who conducted the inspection. He testified:

> . . . we don't maintain because we go out there once a year. There's no way for us to maintain it once a year. We inspect it. As far as maintaining it, that's the platform, that's whoever's out there that's in control of that.

Mr. Hebert clarified that, while Hiller conducted annual inspections, if a technician "write[s] up some equipment," as needing attention, and the customer "calls [Hiller] and say[s], hey, we want y'all to come fix this, then it's not a problem. We go out there and fix it." Here, according to Mr. Guidry, the work order for Hiller's work at the Black Bay facility in April, 2012, was limited to an "annual firefighting safety inspection." While Hiller is capable of performing maintenance work on equipment, there was no request for it to do so at that time. A request would have resulted in a separate work order for work outside the scope of the annual inspection.

2

It is clear that Wood Group intended that Hiller's sole job was to perform an annual inspection, as Mr. Harvey testified as follows:

> Q.      And what does an annual inspection entail?
>
> A.      They come out and check all of our fire and safety equipment to make sure we're in compliance.
>
> Q.      And other than check that equipment, do they do anything else? Are they supposed to do anything else, from your perspective?
>
> A.      Not at that time.

Austin R. Pitre, Wood Group's account manager, too, confirmed that Hiller's sole responsibility was to inspect all of the safety equipment. Hiller would "go around and tag equipment that needed to be serviced." He agreed that that was what "what they're supposed to do."

It is clear that Hiller was only retained to perform an inspection of the safety equipment. It is *equally* clear that Wood Group, which undertook the responsibility of servicing or removing equipment needing service, was (or should have been) familiar with the equipment at the facility over which it had sole operating authority. The testimony at trial did, in fact, indicate that Wood Group was familiar with the cylinder at issue, as Lilton Harvey, Wood Group's production foreman, testified that it had been removed in the past by Wood Group employees.

While Wood Group clearly took responsibility for the cylinder and had handled it in the past, the record clearly reflects that Wood Group did not train its employees, and particularly, those tasked with handling the cylinder in the instant case. In my opinion, and as is discussed more fully below, this failure was the most significant factor in the events which led to the incident.

The cylinder at issue is a Siemens Sinorex clean-agent system which discharges its fire-suppressant agent to fully extinguish a fire, leaving no residue.

3

As David Stahl, Mr. Malta's expert explained, the cylinder has a high-flow nozzle, designed to completely discharge its contents within thirty seconds. Thus, as Mr. Harvey testified, cylinders can accidentally malfunction and discharge their content; however, there would be no evidence that it had discharged as it dissipates entirely. Here, although Dray Hebert noted that the cylinder "has 0 PSI," there was sufficient other evidence, *obvious to all parties*, that the cylinder had not accidentally discharged.

Mr. Hebert noted in his report that the cylinder was full, with a weight of 245 pounds. The cylinder, when it is empty, weighs 110 pounds. It is considered full when it is filled with 134 pounds of fire-suppressant agent.[1] In his report, Mr. Hebert indicated the cylinder's weight to be "stamped full" with a weight of 245 pounds, a significant difference from an empty 110 pound cylinder. This, alone, would indicate to anyone with any knowledge of these cylinders that it had not accidentally discharged **and was not empty**. While Mr. Harvey "read [Mr. Hebert's] report" and "understood" (i.e. assumed) that it had discharged erroneously because of the 0 PSI reading, a proper reading of the report would have alerted him to the fact that the cylinder was, in fact, full of the fire-suppressant agent. Having signed off on all of Mr. Hebert's reports, Mr. Harvey is legally presumed to have read and understood its contents. *See*, *e.g.*, *Brown v. Simoneaux*, 593 So.2d 939, 941 (La. App. 4 Cir. 1992)("[a]n individual who signs a written instrument is charged with the responsibility of having read it and is presumed to know and understand its contents"); *Guimmo v. Albarado*, 99-286, p. 7 (La. App. 5 Cir. 7/27/99), 739 So.2d 973, 976 ("when a party signs papers they are presumed to know the contents of those papers.").

---

[1] Here, there was 135 pounds of the fire-suppressant agent in the cylinder. Thus, the cylinder had 1 pound more of the agent than required to be full.

4

It is important to note, at this juncture, that there is a distinction between the amount of liquid in a cylinder and the amount of pressure it contains. The witnesses who were questioned about this issue all indicated that the amount of liquid does not determine the amount of pressure in a cylinder. Mr. Pitre explained that the level of liquid in a cylinder is not a factor in whether the cylinder will discharge; it is the pressure within the cylinder that causes it to discharge. However, as David Stahl, further explained, "you can't have liquid and not have pressure. Where there's liquid or product, there's pressure."

There is no question that Mr. Hebert's sole responsibility was to conduct an inspection and to report his findings, including the deficiencies. Mr. Hebert prepared two reports at the conclusion of his inspection. The first, a Clean Agent Cylinder Report, accurately noted that the cylinder was full of liquid, but noted that it "ha[d] 0 PSI." The Deficiencies report noted that "cylinder has 0 PSI and needs to be sent in for recharge." The error in these reports, as Mr. Stahl explained (and as Mr. Guidry likewise agreed), was in stating that the cylinder "had" 0 PSI, as opposed to "gauge reads 0 PSI."

This failure warrants a finding of fault on Mr. Hebert's (Hiller's) part. However, I do not believe that, given the totality of the circumstances and Wood Group's fault, Hiller bears a significant share of the comparative fault. I would assign 25% fault to Hiller. Wood Group's decision to handle the transportation of the cylinder itself and its complete failure to train its employees in the proper handling of the cylinder was, in my opinion, a far greater factor in the accident and I would assess it with 50% of the fault. Mr. Malta, as discussed more fully below, ignored warning signs, and proceeded without questioning those signs, and thus, bears some fault as well. I would assess Mr. Malta with 25% fault.

In my view, the factors culminating in the accident started well before the accident, with Wood Group's failure to properly train its employees. This failure

5

to train was compounded by the events of the accident date, April 4, 2012, the day after Mr. Hebert had left the facilities. That morning, Wood Group had a regular safety meeting, at which time the removal of the cylinder for servicing was discussed. Despite the fact that many of the Wood Group's employees had never before dealt with this cylinder, Wood Group gave no instructions or basic guidelines that morning on how it should be handled or any protective equipment with which to perform their work. Mr. Malta was one of those employees who had never handled this type of cylinder. He testified that he had absolutely no training on fire-suppression systems. Nor did he have any training on the type of cylinder involved in this accident.

Wood Group's failure to properly train its employees is clearly a violation of industry standards. According to Mr. Stahl, Mr. Malta's expert in fire protection maintenance practices, the National Fire Protection Association (which provides the industry standards governing the maintenance, installation, design of these systems), requires that those who operate or maintain fire extinguishing systems be thoroughly trained. Those standards include the following:

> Personnel involved with fire suppression system cylinders must be thoroughly trained in the safe handling of the containers, as well as in the proper procedures for installation, removal, handling, shipping, and filling; and connection and removal of other critical devices, such as discharge hoses, control heads, discharge heads, initiators, and anti-recoil devices.

Mr. Harvey, who was "essentially in charge of the entire platform," was well aware that when a cylinder discharges, "it becomes like a missile" and his training is to take extra precautions when dealing with something that is pressurized. However, even he had no "training or dealing or familiarity with [this] type of cylinder before [the] incident." In fact, Mr. Harvey had no knowledge that the cylinder involved in this case was a "specialized cylinder" as this is the only cylinder of its kind at the Black Bay facility. After there was a "root cause

6

analysis," he admitted that "this one actually has to have a plug or something installed in it." Thus, not only did he have "no specific training on how to deal with these specialized cylinders . . . none of [his] employees would have either." Mr. Harvey acknowledged that Wood Group could have obtained training for its employees on handling this type of cylinder:

> Q. Do you recall any indication of any type of training so that these people would know exactly how to remove those particular cylinders?
>
> A. Not that -- No, sir.
>
> Q. And if at any point in time you wanted training from Hiller, you could have just asked Hiller, and Hiller would have provided that training; is that right?
>
> A. We could have -- Hiller could have -- I had to get it approved. Hiller doesn't provide anything for free.

That Wood Group gave no training to its employees was also confirmed by Mr. Lowery, a Wood Group electrician, who was tasked with the removal of the cylinder. He testified that he had no instructions whatsoever as to how to transport pressurized gas cylinders. Nor had he ever even seen the transport of a cylinder like the one involved in this case.

At the safety meeting on the morning of the accident, Mr. Harvey asked John Lowery to remove the cylinder. Mr. Lowery, in turn, asked Donald Crain, a control room operator, to move it to the outside of the generator building so that it could then be transported for servicing. Mr. Crain testified that he had no training whatsoever on the removal of this type of cylinder, and never had any safety training on fire-suppressant systems in general. The training he did receive from Wood Group included the instruction to pick up a cylinder "either [by] the double-choke hold with a sling or a cylinder bottle rack."

7

Neither a sling nor a cylinder bottle rack was used in this case. After Mr. Crain moved the cylinder to the platform for off-loading, it was lowered into a liftboat, where it was tied to a handrail.

Robert Fleming, a crane operator who had been notified by radio that there was a cylinder coming that needed to be unloaded with a crane, arrived and hooked a cargo basket to the crane, lowering it into the liftboat. Mr. Lowery and Mr. Crain, who were in the liftboat, then placed the cylinder in the cargo basket. At the second platform, where the cylinder was to be off-loaded, Mr. Fleming raised the basket to the warehouse platform. As he was swinging the cargo basket around to place it on the platform, Mr. Malta was acting as a "spotter" to assist in bringing the cargo basket down. Mr. Malta grabbed the rope, and guided the basket to the deck.

Mr. Malta then "bear hugged the cylinder" to remove it from the basket. Mr. Malta testified that, as he put the cylinder down on the grating and "attempted to pull it back and draw it on its access so [he could] roll the bottle to a staging area," the bottle began to hiss. He tried to push the cylinder out of the way, but it "went ballistic" and started spinning, striking him.

The testimony at trial is that there are different ways to unload a cylinder; Mr. Fleming testified that one could "use a strap or cargo basket, . . . [or] put [it] in a rack." Mr. Crain, though, had no instructions on the use of a rack as a requirement for moving this cylinder. Nor did he receive instructions from Wood Group as to manually moving a cylinder (i.e., "how to actually grab it or move it by hand.").

Mr. Harvey also confirmed that cylinders are supposed to be handled with a protective rack. He testified that "[a]ll bottles get moved with a rack." Importantly, he indicated that it was a mistake for the crew to have moved the cylinder without a rack:

8

A. They're supposed to get moved with a rack.

Q. So it was a mistake for that crew to move that bottle without a rack?

A. Yes, sir.

Q. And that crew should have known that?

A. Yes, sir.

Q. There's no question about that?

A. There's no question about it.

Mr. Harvey also indicated that Wood Group had racks for cylinders. He further testified that this cylinder "could have fitted in one of those rack[s]" or that Wood Group "could have gotten a rack for it" or "rented one."

Mr. Pitre also testified that racks protect cylinders from being damaged or causing them to depressurize. However, according to Mr. Pitre, there was no rack on location "for this particular operation." And, while he indicated that not every rack fits every cylinder and sometimes, a rack has to be built, "this cylinder should not have been shipped or transported without a rack." Mr. Pitre further indicated that "it would be against safety guidelines to do so."

Mr. Malta had previously moved many other types of cylinders, which "[f]or the most part [are] in bottle racks." However, because he had never handled this type of cylinder before, Mr. Malta did not know that it is normally moved in racks, nor that it should have been moved in a rack. Clearly, Wood Group's failure to train Mr. Malta that this type of cylinder should only be moved in a rack was a contributing factor to Mr. Malta's mishandling of the cylinder and the accident.

While moving the cylinder without any protective devices was clearly a mistake, it is equally clear that all of Wood Group's employees were aware of the fact that, under all circumstances, cylinders are to be treated as though they are pressurized. The unrefuted testimony of the Wood Group witnesses was they are

9

to handle cylinders as though they are pressurized. Mr. Harvey testified that "one of his pet sayings is 'Never trust a gauge'" because "a gauge can give a zero pressure when there can still be pressure in it." Accordingly, his training is to always assume that a cylinder is pressurized. When asked whether his workers are trained to read the transportation instructions on cylinders, he responded: "[n]ot to the extent of every cylinder. We treat every cylinder the same, as if it was under pressure."

That Mr. Harvey was aware that the cylinder still could have had pressure was confirmed by the following exchange:

> Q. So you knowingly sent these guys to remove this particular cylinder, knowing that it could still be pressurized; right?
>
> A. Yes, sir.
>
> Q. And even though the gauge read zero, it could still be pressurized?
>
> A. Yes, sir.

The other Wood Group witnesses who testified on this issue agreed as to this practice. Mr. Crain was trained by Wood Group to "always assume that a cylinder, . . . or bottle of this type, is under pressure" and to "always treat a cylinder like this as if it's under pressure." Mr. Fleming, too, testified that cylinders should always be treated as pressurized and that, "unless the top is completely off, there could always be some pressure in it."

Similarly, Mr. Guidry indicated that, according to "common practice, you never approach a pressurized cylinder and think that it has 0 psi. There's always residual pressure." Mr. Lowery testified that, even if a gauge "read empty," there could still be pressure in a cylinder. He stated: "Any bottle could be empty and still have pressure in it."[2] Mr. Lowery agreed that, "no matter what the Hiller

---

[2] The witnesses called cylinders "bottles" and "cylinders" interchangeably."

10

representative or the gauges said, [he] knew from [his] own experience that there could still be pressure in that cylinder when [he was] removing it."

The most telling testimony came from Mr. Malta, who had moved cylinders many times, including off-loading them from vessels, and estimated that he had done so approximately a thousand times. However, he had never before handled the type of cylinder involved in this case. He testified that he "would always take and treat every bottle as if it was full, whether it was empty or not." He also stated that he was trained to always assume that a cylinder of compressed gas always has pressure in it. The following colloquy then took place:

> Q. So you should assume and treat it as if it was pressurized; is that right?
>
> A. And I did.
>
> Q. Would you have treated this cylinder differently when you off-loaded it from the cargo basket if it had been full, as opposed to empty?
>
> A. No; treated it the same.
>
> Q. So whether it was full or if it was empty, you would have treated it the same?
>
> A. That's correct, in the safest manner possible.

While Mr. Malta testified that he understood the cylinder to be empty with 0 PSI in it, he answered in the affirmative when asked whether he "treated it as if it still might be pressurized because . . . even though [he] saw the 0 psi on the gauge, [he] too [was] concerned that it still might have some pressure in it."

Another major factor in the accident attributable to Wood Group was its failure to train its employees to ensure that the cylinder was either disabled so that it could not discharge, or that a protective device was placed on it to ensure that it would not accidentally discharge. This demonstrates that the lack of training and an understanding of the risks were predominant factors in the accident.

11

As Mr. Stahl explained, the top of the cylinder has a discharge port through which the fire-suppressant agent is discharged. The discharge can be actuated in one of two ways. First, there is an electrical solenoid valve, which is the electrical portion of the discharge head, which is electrically actuated. Second, the cylinder can be actuated manually by activating the manual lever. The manual lever is protected from discharging by a "safety pin."

According to Mr. Harvey, Wood Group employees "are supposed to make sure that the pin is in place to prevent an accidental discharge." Additionally, there is a plastic tie that holds the pin in place, and the employees are "supposed to make sure that that's in place before they move the cylinder." When the tie and the pin have been removed, "you know that that cylinder had [gone] off or this fire extinguisher had [gone] off."

Here, the testimony reflects that, before the cylinder was transported, and before he moved the cylinder to the area of the crane, Mr. Lowery removed the solenoid valve, but the pin remained in the cylinder. At that point, with the solenoid valve removed, and as Mr. Pitre confirmed, the only way for the cylinder to accidentally discharge is if the safety pin protecting the manual actuator was removed or became dislodged.[3]

While many of the witnesses testified that they knew the importance of having a pin in the cylinder when it is moved, the evidence clearly shows that there was a pin in place at the time that Mr. Malta began to handle it. A pin with no other protection was clearly insufficient to prevent an accident. Thus, according to Michael Brast, Hiller's expert, "the only way it really could discharge is if [Mr. Malta] hit [the pin] . . . [b]ecause the minute you hit it, it's gone. It's instantaneous. It doesn't have a delay in it." Thus, while Mr. Lowery removed the

_____

[3] The cylinder could also have discharged if it had been dropped, as several witnesses testified, although there was no evidence that it had actually been dropped.

12

solenoid, his failure to remove the manual actuator rendered the cylinder volatile and unsafe. In fact, Mr. Stahl testified that, had the manual actuator been removed, the cylinder could not have discharged. But Mr. Lowery, as an electrician who had only dealt with electrical solenoids, had never handled a manual actuator and had never been told that that it was unsafe to transport the cylinder with the manual actuator still in place.

Mr. Guidry and Mr. Hebert both also confirmed that the removal of the manual actuator would have disabled the cylinder and rendered it safe for movement.

Mr. Brast testified that there was another method by which the cylinder could have been made safe for removal, by capping the discharge port. This would also have prevented the cylinder from discharging. In his opinion, the person who removed the cylinder was not trained and did not know that the actuator should have been removed or capped before transporting it.

With respect to capping the cylinder, Mr. Lowery testified that most cylinders have caps on them. Mr. Fleming confirmed this fact and testified that cylinders without protective caps are prone to being damaged, causing the propellant to discharge.

Importantly, Mr. Malta, too, recognized that he was moving a cylinder without a rack. Nor was there a cap on the cylinder, something he noticed when he first saw the cylinder. Despite knowing that there should have been a protective cap, Mr. Malta proceeded to handle it. Mr. Malta testified that, although he had seen cylinders moved around without racks, he had never seen a cylinder moved without a protective cap. He stated that "[t]he only bottle without a protective cap was this bottle here, the one in question that hit me." He testified as follows:

> Q. . . . didn't you say previously that you saw acetylene bottles and oxygen bottles moved about the platform without caps?

13

A.    No, never said that.

Q.    So it's your testimony you never saw a bottle moved
        without a cap on it?

A.    Only this bottle here.

Although Mr. Malta explained that he felt it was safe to handle the cylinder because he had been told that it was empty with no pressure, this directly conflicts with his clear testimony that he was trained to always treat a cylinder as though it had pressure in it. Mr. Malta agreed that he could have asked for help, but he did not see the need to do so. He agreed that he "took no action to alert any one of [his] supervisors that [he] was being asked to off-load a cylinder with no cap and no bottle rack." Nor did he advise the crane operator "that there was a problem since there was no bottle rack or protective cap." To the contrary, he "[d]id what [he] was told to do, by orders of Mr. Lilton Harvey." Both Mr. Harvey and Mr. Pitre testified that Wood Group has a policy where an employee can stop work if he perceived a safety issue.

There was also testimony that an anti-recoil device could have been used, and according to the instructions of the cylinder's manufacturer, *was* to have been used to prevent an accidental discharge. As Mr. Stahl explained, the type of cylinder involved in this case does not have threads to screw a protective cap on; this is where an anti-recoil cap comes into play. He indicated that it is a plug that, in the event that a cylinder is activated, prevents the cylinder from jettisoning; "it just lets out a small amount [of pressure] until the bottle finally exhausts itself." It prevents the cylinder from moving.

At the time of the incident, Mr. Harvey did not know what an anti-recoil was and indicated that none of Wood Group's employees had been trained on the use of such a device. Nor had he ever read the label of the cylinder until after the incident. He confirmed that the label gave instructions for transportation that

14

indicated that an anti-recoil device was required. In fact, Mr. Pitre testified that the cylinder label has big, red letters, stating "DANGER" which warns that an anti-recoil device should be put in place if the cylinder is disconnected. Neither Mr. Malta nor Mr. Lowery knew what an anti-recoil device was either. According to Mr. Pitre, at that time, Wood Group had no policy against transporting cylinders without any type of anti-recoil device or some type of transportation cap on them.

In addition to these failures, Mr. Harvey identified other failures when he testified as follows: (1) "none of them [the Wood Group employees] handled the cylinder the way they should have handled it;" (2) Mr. Malta should not have bear-hugged the cylinder because "Wood Group training is not to bear-hug a cylinder and grab it. That's not our training;" and (3) Mr. Malta "shouldn't have grabbed [the cylinder] out of the basket. It shouldn't have even been placed in the basket."

Mr. Stahl confirmed Mr. Harvey's testimony that the cylinder was mishandled by Wood Group's employees who were not properly trained in the maintenance and handling of fire-suppressant systems. He also testified that it is "taboo" to transport a cylinder in a cargo net, stating "[t]here's not a shipyard or a facility in the world, that will let me transport them in a cargo net. They have to be upright and strapped in. . . ."[4]

Thus, while I agree with the majority that Hiller bears some fault for the accident given Mr. Hebert's failure to clarify that the gauge "read" that the cylinder had 0 PSI, as opposed to stating that it had 0 PSI, in my opinion, this one factor played a smaller role in the accident. Wood Group's decision to handle the transportation of the cylinder itself and its complete failure to train its employees in

---

[4] The testimony was that the cylinder had been placed in a cargo net during its transport. According to Mr. Lowery, they had no materials to strap the cylinder on to a pallet. Nor was the cylinder placed into a cargo net to be lowered into the boat. It had simply been placed on the deck before being placed in the boat. Thereafter, the cylinder was placed in a cargo net when they arrived at the other platform other platform, where the three men participated in putting the bottle into the cargo net. Mr. Lowery's only instructions were to "move the [cylinder]." It was when Mr. Malta was removing the cylinder from the cargo net that it discharged.

the proper handling of the cylinder was a far greater factor in the accident. Wood Group's further failure to follow the specific manufacturer's instructions, readily observable on the cylinder itself, warning of danger and instructing that an anti-recoil device is to be used when the cylinder is disconnected, likewise contributed to the accident. Mr. Malta also ignored warning signs – he knew there was no rack for transport and noted that there was no protective cap on the cylinder. Despite this, he chose not to stop the work or question a supervisor about these warning signs and proceeded without caution. This is particularly problematic given that Mr. Malta, like all of Wood Group's employees, knew to treat the cylinder as though it was pressurized. Had he done so, by ensuring that it was safe to handle, the accident would not have occurred.

Based on the foregoing, in my opinion, the parties all bear some comparative fault for the accident. I would find that the negligence of Hiller and Mr. Malta were the foremost factors in the accident. As previously stated, I would assign 25% fault to Mr. Malta, as his own actions in handling a cylinder without a rack and which he knew had not been capped, with the knowledge that it could still be pressurized, contributed to the accident. Because neither he nor any of the Wood Group employees were fully or properly trained by Wood Group in the handling of pressurized cylinders, I would assign Wood Group with 50% fault. The remaining 25% fault, I would assign to Hiller/Mr. Hebert.